William C. PRICE, Marlin W. Law, Doris
E. Law, Troy L. Hankins, and Donald
J. Taylor, Appellants,

v.

S. S. FULLER, INC., Appellee.

No. 5004.

Supreme Court of Alaska.

Jan. 29, 1982.

Allen McGrath and Stephen C. Hillard, Graham & James, Anchorage, for appellants.

John W. Colver, Warren C. Colver & Associates, Anchorage, for appellee.

Before CONNOR, BURKE, MATTHEWS and COMPTON, JJ., and DIMOND, Senior Justice.*

## OPINION

DIMOND, Senior Justice.

Fuller leased some land to Edna Cox. She assigned the leases to Price.[1] In October 1978 Fuller commenced an action against Price (a) to recover the leased premises, and (b) for unpaid rent, taxes and damages. Judgment in favor of Fuller was entered against Price in October 1979. Price has appealed.

## I. VALIDITY OF LEASES

Most of the leased land was not covered by any recorded subdivision plat. Price argues that granting summary judgment in favor of Fuller and against Price was improper because the leases of unplatted land were illegal and therefore voidable.

There is a split of authority among various state courts as to whether transfers and contracts for sale of unplatted land are enforceable.[2] We conclude that the better approach is to find that such transfers and contracts for sale are enforceable unless it is clear that the legislature intended an opposite result.[3]

This conclusion is consistent with our decision in *Gates v. Rivers Construction Co.*, 515 P.2d 1020 (Alaska 1973), in which we considered the enforceability of a contract which violated a statute.[4] *Gates* held that an employment contract between an alien and an Alaskan employer was enforceable despite the fact that it was in violation of a federal immigration statute. In *Gates* we rejected the traditional rigid rule that any contract which violates a statute is void. Instead, we held that "when a statute imposes sanctions but does not specifically declare a contract to be invalid, it is necessary to ascertain whether the legislature intended to make unenforceable contracts entered into in violation of the statute." *Id.* at 1021.[5]

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11, of the Alaska Constitution, and Alaska R.Admin.P. 23(a).

1. For purposes of convenience, the lessor, S. S. Fuller, Inc., will be designated as "Fuller", and the partnership of which the appellants are members will be designated as "Price".

2. Annot., 77 A.L.R.3d 1058 (1977).

3. *Montagna v. Marston*, 24 Md.App. 354, 330 A.2d 502 (1975); *Marriott Financial Servs., Inc. v. Capital Funds, Inc.*, 288 N.C. 122, 217 S.E.2d 551 (1975); *Gilmore v. Hershaw*, 83 Wash.2d 701, 521 P.2d 934 (1974). *Contra, Smith v. Bach*, 183 Cal. 259, 191 P. 14 (1920).

4. We have used contract principles before in deciding certain lease cases. *E.g., Lathrop Co.*

*v. Lampert*, 583 P.2d 789, 790 (Alaska 1978); *Wessells v. State*, 562 P.2d 1042, 1046 (Alaska 1977); *Rego v. Decker*, 482 P.2d 834, 836 (Alaska 1971). In addition, the Restatement (Second) of Property suggests the use of contract principles in deciding lease illegality questions. Restatement (Second) of Property § 9.1, comments b, c (1977).

5. We also listed numerous factors which could be used in determining the legislature's intent concerning the enforceability of such a contract:

 [T]he language of the statute; its nature, object, and purpose; and its subject matter and reach; the wrong or evil which the statute seeks to remedy or prevent; the nature of the prohibited act as malum in se or malum prohibitum; the class of persons sought to be controlled; the legislative history; the effect

In the present case the statute which attaches a penalty to the transfer of unplatted land, AS 29.33.190(a), is malum prohibitum and does not expressly provide that transfers of unplatted land are unenforceable. It merely provides a minor criminal penalty of a misdemeanor with a $500 fine and also gives the borough the right to seek to enjoin the transfer.

There is no legislative history of the statute. But from the face of the statute its purpose would appear to be to enforce the borough's planning and zoning requirements and not to regulate rights *inter se* of contracting parties. The statute lists two remedies for violation of platting laws, criminal penalty and injunction by the borough, but does not provide a third remedy of unenforceability.

■ The forfeiture of tens of thousands of dollars which would be visited upon Fuller if the leases are unenforceable is all out of proportion to the $500 fine imposed by the statute. Under the standard enunciated in *Gates*,[6] such forfeiture possibility requires a showing that the legislature clearly intended that such leases be unenforceable. Price has not made that showing. We conclude that the leases are enforceable.

## II. UNPAID RENT AND TAXES

There were three leases. The combined monthly rental was $2,000. Price ceased paying rent in April 1978. On October 5, 1979, the superior court entered a final judgment for Fuller which included $22,000 "for arrearages in rental payments from April of 1978, through February of 1979." Price argues that all liability for rent ended upon the service of notice of forfeiture by Fuller on October 12, 1978, or in the alternative, at least by November 21, 1978, when Fuller was awarded partial possession of the premises pendente lite by court order.

■ The lease expressly reserved to the landlord (Fuller), by notice to the tenant (Price), the right to terminate the lease for nonpayment of rent. In *Brown v. Music, Inc.,* 359 P.2d 295, 297 (Alaska 1961), this court held that a tenant's duty to pay rent ceases upon the termination of the lease by the landlord.[7] *Accord,* Restatement (Second) of Property § 12.1, comment g (1977). After termination, the tenant is no longer liable for rent; thereafter he is only liable for damages resulting from the unlawful withholding of possession from the landlord. *Brown v. Music, Inc.,* 359 P.2d at 296–97. The court went on to note: "Damages resulting from the former tenant's failure to surrender possession of the leased premises normally would be the reasonable value of the use of the premises, *i.e.,* their rental value during the period of wrongful possession." *Id.* at 298. *Accord, Wright v. Vickaryous,* 598 P.2d 490, 499 (Alaska 1979); *Stokes v. Van Seventer,* 355 P.2d 594, 597 (Alaska 1960).[8]

of holding contracts in violation of the statute void; and the later repeal of the statute by a new act which specifically provides that a contract in contravention thereof should be void.
*Gates v. Rivers Constr. Co.,* 515 P.2d 1020, 1021 (Alaska 1973), *quoting* Annot., 55 A.L. R.2d 488–90 (1957).

6. *Gates v. Rivers Constr. Co.,* 515 P.2d 1020, 1021 (Alaska 1973).

7. Price makes the argument that, under *Klinger v. Peterson,* 486 P.2d 373 (Alaska 1971), a lease cannot be terminated until so held in a court judgment. Price relies on the following language in *Klinger*: "In Alaska, absent a special agreement of the parties, a leasehold interest in land can be terminated prematurely only by a judicial decree in a statutory action." *Id.* at 378. In *Klinger,* the landlord had attempted to terminate the lease by simply serving a notice

to quit on the tenant. The court held this to be insufficient since the lease contained no mention of a right to termination. Therefore, because the common law does not allow the landlord to retake possession for nonpayment of rent in the absence of express provision in the lease allowing such a termination by a reserved right of reentry, the plaintiff's sole remedy was to bring the statutory action and any purported notice to quit was ineffectual in terminating the lease.

8. The Restatement (Second) of Property is in accord in entitling a landlord to recover from a holdover tenant "after the termination of his lease for the use and occupation of the leased property during the holdover period at a rate based on the previous rental rate; or on the proven reasonable value independently established if that differs from the previous rental value." Restatement (Second) of Property

██ Here the lease was terminated by the October 12, 1978, notice to quit. Since the rent accrued on the first of each month, and Price ceased payment of rent in April 1978, he would properly be charged with the $2,000 per month lease rental from April through October 1978, for a total of $14,000 in back rent.

In addition, Price would be liable for damages or mesne profits [9] during the period he was an unlawful holdover tenant. This would be from November 1, 1978, to at least November 21, 1978, when Fuller was awarded partial possession of the premises pendente lite by order of the court. Fuller did not get complete possession at that time because the court prohibited Fuller from transferring the leasehold to any third party until after approximately December 31, 1978.

Price did not present any evidence of the reasonable rental value of the property during the time that Fuller was out of possession, or had limited possession with no right to transfer the land to a third party. Thus, the previous rental rate was properly utilized by the court in computing reasonable rental value. This was especially appropriate in this case for the period November 1 through December 31, 1978, since Fuller was a land developer and the mere possession of land without the ability to lease it to another developer was practically worthless to Fuller.

The court was correct, then, in awarding Fuller an additional $4,000 for the period from November 1 through December 31, 1978, for a total sum (including the rent due from April through October 1978) of $18,000. But we believe the court was mistaken in awarding an additional $4,000 for the months of January and February 1979, since Fuller had full and complete possession of the premises, without restriction as to use, commencing on approximately January 1, 1979. Thus, we remand the case with directions to change the award for "rental" from $22,000 to $18,000.

Price also claims that the award of $19,640 for taxes was in error since it represented taxes not only for 1978 but also for the first quarter of 1979. However, this contention is without merit, since the record clearly establishes that the $19,640 is only for 1978 taxes and does not include any 1979 assessments. Therefore, the court's award of the full $19,640 in 1978 taxes was correct.

### III. THE ROAD AND WATERLINE CLAIM

The superior court found that, pursuant to the terms of the Road and Water Agreement of January 20, 1978, Price had agreed to bear a proportionate share of waterline and road improvements made which affected the leaseholds. In accordance with that conclusion, it awarded Fuller $14,825, the balance due on a promissory note executed by Price to reimburse Fuller for waterline improvements, and $70,563 as Price's proportionate share of the cost of 58th Street, a road which had been constructed adjacent to the leased parcels. Price maintains that final judgment on these claims was improper.

The January 20, 1978, document provided that Price would build 59th Street adjacent to the leased property at his sole expense. According to the agreement, Price was to have begun construction of 59th Street by July 15, 1978, and to have substantially completed the road by November 15, 1978.

If 59th Street was not completed within this time schedule, the agreement provided that Fuller would have a lien against the leased property for an amount equal to one-half of the cost of constructing 58th Street, which had been built in 1977. Price

---

§ 14.5 (1977). As the commentary makes clear, in the absence of evidence that the rental value of the leased property has increased or diminished since negotiation of the rent at the time of the agreement to lease, that negotiated rental rate will determine the rate at which the holdover tenant must pay. *Id.* at comment a.

9. The damages for which a holdover tenant may be liable are sometimes referred to as mesne profits.

had done nothing towards constructing 59th Street when Fuller filed his October 1978 complaint in which he sought to collect damages for one-half of the cost of 58th Street.

Fuller's complaint alleged that, pursuant to the Road and Water Agreement, Price had agreed to pay the cost of a proportionate share of roadwork improvements, and that he had specifically agreed to pay one-half of the cost of the installation of 58th Street.

In his original answer to Fuller's complaint, Price expressly admitted that he had agreed to pay a proportionate share of road work, but denied that he undertook liability for one-half of the cost of 58th Street. As an affirmative defense, he claimed that both parties had made mutual mistakes of fact concerning the costs, economics and time required for satisfying municipal subdivision requirements when installing improvements. He claimed that increased costs had made it difficult for him to obtain financing and capital for improvements he had agreed to construct, and that this constituted excusable delay in installing improvements.

On December 26, 1978, Fuller moved for summary judgment on all issues. After a summary judgment hearing in February 1979, the superior court granted Fuller partial summary judgment on all issues except the exact amount Price owed Fuller for 58th Street. The court reserved this issue for determination at an evidentiary hearing.

On March 2, 1979, at the first of two evidentiary hearings on the cost of the road, Fuller testified as to the existence of the contract and his damages under it. On April 9, at the second evidentiary hearing, Price for the first time raised the issue of mutual assent to the contract by testifying

that Fuller had refused to sign the contract until adequate financial statements were provided by all members of Price's partnership. Fuller did not object to this testimony and the trial court subsequently allowed Price to amend his answer to deny mutual assent to the contract.

After the evidentiary hearings and the amendment of the pleadings by Price, the superior court granted final judgment on the Road and Water Agreement to Fuller and awarded him damages. Price's primary argument on appeal is that there was no mutual assent to the Road and Water Agreement and that judgment in favor of Fuller was therefore improper.

The granting of the initial partial summary judgment was clearly proper on the basis of the pleadings and affidavits before the court at that time. As moving party, Fuller was required to show the absence of material issues of fact concerning the agreement, and entitlement to judgment as a matter of law.[10] Price had, in his answer, expressly admitted an agreement to share proportionately the costs of road and water improvements. On the day the answer was filed, Price delivered a letter to Fuller's attorney, which impliedly admitted the existence of the agreement. The letter contained a demand that Fuller execute a re-plat of the property, pursuant to the January 20, 1978, Road and Water Agreement. In addition, Price had executed a promissory note in favor of Fuller for the amounts due for the waterlines as required by the terms of the contract, and had made the initial payment required by the contract. Thus, there appeared to be no genuine issue as to mutual assent at the time partial summary judgment was granted.[11]

However, after purportedly deciding the merits of the existence of liability

---

**10.** *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 24 (Alaska 1978).

**11.** There was also no support for Price's claim of mutual mistake concerning the cost of installing improvements. His only claim in the affidavits is that the municipal subdivision requirements might have been different at the time the agreement was originally made. In contrast to his claim that there was a mistake as to the cost of improvements, Marlin Law, one of the members of the Price partnership, testified that the partners knew the cost of construction of 58th Street when they signed the Road and Water Agreement.

under the Road and Water Agreement in the grant of partial summary judgment, the superior court reopened the issue by allowing Price to amend his pleadings.[12] As Price points out, this amendment related back to the original answer,[13] which means that Price's original admission of an agreement to pay a proportionate share of road and water improvements was superseded.

The subsequent amendment to the pleadings was made to conform the pleadings to the evidence presented by Price at the April evidentiary hearing at which he, in effect, tried the issue of mutual assent as well as the issue of the amount of damages to be awarded. At the termination of all the proceedings, the superior court made a factual finding that there was mutual assent to the Road and Water Agreement.

In order to overturn factual findings of the trial court, we must arrive at a definite and firm conviction, in the light of the entire record, that the trial court was clearly mistaken. *Alaska Foods, Inc. v. American Manufacturer's Insurance Co.*, 483 P.2d 842, 843–48 (Alaska 1971); Alaska R.Civ.P. 52(a). We conclude that the superior court finding was not clearly mistaken. In spite of Price's denial of mutual assent to the Road and Water Agreement, there was evidence to support a finding that Price had agreed to pay a share of the costs of constructing 58th Street.

In addition to the depositions, exhibits and affidavits that had been before the court during summary judgment proceedings, there was the testimony of both Fuller and Price at the evidentiary hearing. Fuller contradicted Price's denial of the contract and testified that the parties had agreed to split the costs of the road. In a factual hearing before the trial court, it is the court's function to judge the credibility of the witnesses. Alaska R.Civ.P. 52(a). The superior court obviously placed credence in Fuller's testimony over that of Price, and reached the conclusion that Price was obligated under the Road and Water Agreement. This is apparent from the superior court's findings of fact and conclusions of law entered on August 30, 1979, upon which the court's judgment for Fuller is based. Price has not convinced us that the superior court was clearly mistaken in reaching this result.

In the Road and Water Agreement, Price also agreed to reimburse Fuller for a portion of the costs of construction of a waterline under 58th Street. Pursuant to this part of the agreement, Price paid one-third of the amount due on the waterline at once, and gave Fuller a promissory note for the remaining two-thirds.

Price failed to make the payments on the promissory note as they became due. As part of the final judgment, the superior court awarded Fuller the full balance due on the note. Price raises the same mutual assent claim here as he did with regard to the road. For the reasons discussed above, we conclude that the superior court was not clearly mistaken in finding Price obligated under the Road and Water Agreement with respect also to the waterline.[14]

---

**12.** While the adjudication of the summary judgment motion constituted the "law of the case" which the trial court was not required to reexamine absent a showing of the discovery of new facts which could not have been presented originally in the exercise of due diligence or of an intervening change in law, the trial court clearly had the power to reexamine its decision any time up until final judgment if it so desired. *Slotkin v. Citizens Cas. Co.*, 614 F.2d 301 (2d Cir. 1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980); *Swietlowich v. Bucks County*, 610 F.2d 1157 (3d Cir. 1979). Law of the case is a rule of policy and practice, not law. *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 & n.5 (Alaska 1977). *See also Stepanov v. Gavrilovich*, 594 P.2d 30, 36 (Alaska 1979); *Austin v. Fulton Ins. Co.*, 498 P.2d 702, 704 (Alaska 1972).

**13.** Civil Rule 15(c) provides in part:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

**14.** Because we conclude that the trial court properly found Price obligated for a share of road improvements under the Road and Water Agreement, we do not reach Price's claims concerning the court's alternative holding that Price's liability rested on a covenant in the original lease from Fuller to Cox which had been assumed by Price.

We conclude, however, that, while it was proper to find that Price had agreed to pay a share of road and waterline costs, the amount of damages awarded to Fuller was in error.

As stated in Corbin on Contracts:

When justice seems to require that a contractor's duty to perform his promise should be conditional on some fact or event, the court should hold it to be a condition of the duty unless the parties clearly expressed an intention to the contrary.

3A A. Corbin, Corbin on Contracts § 653, at 133 (1960).

In many cases ... it may be difficult to determine whether the parties intended such a condition or not; ... this need not be determined at all if the court is willing to hold that justice requires the condition whether the parties intended it or not.

*Id.*, § 632 at 23.

It appears clear to us that justice requires that Price's liability for a proportionate share of road and waterline improvements be conditioned on the continued existence of the leasehold interests. In return for Price's agreement to pay a share of the costs of improvements on the leasehold, Fuller had agreed to forego his potential claim against the leasehold resulting from Cox's alleged defaults. Without the continued existence of the leaseholds, Fuller's promise was virtually worthless to Price. Also, without the continued existence of the leaseholds, Price received little benefit from improvements he was required to pay for.

■ Accordingly, we conclude that Fuller's damages should be recalculated to reflect only the proportionate cost of the improvements from which Price actually benefited during the term of the leaseholds. This could be done by depreciating the cost of the improvements over the life of the improvements and requiring Price to pay one-half of the amount of depreciation for the period in which he was in possession of the leasehold interests. We remand the case for a computation of Price's share of the road and waterline costs either under the formula we have suggested or by some other method which will cause substantial justice to be achieved.

## IV. EFFECT OF DISMISSAL OF CLAIM AGAINST COX

During the February 1979 summary judgment hearing, Fuller and Cox stipulated to a dismissal of their claims against each other. The stipulation was apparently based upon an out-of-court release by the parties of their claims against each other. On appeal, Price maintains that, because Cox remained liable based on privity of contract as the original lessee for Price's defaults as her assignee, the release of Cox acted as a release of Price.

■ Price argues that in the commercial setting of this case the common law rule that release of one joint obligor under a contract will release the other should apply, and that release of Cox should release Price from liability under the same claims. *Cf. Young v. State*, 455 P.2d 889, 893 (Alaska 1969). However, this case simply does not involve "joint obligors" in the common-law sense. Rather, the original lessee is secondarily liable to the lessor as between him and his transferee; that is, the original lessee is, in effect, a surety. Restatement (Second) of Property § 16.1(1)(a) and comments c, e (1977). This relationship does not arise from both the assignor and the assignee being parties to the same contract, but rather arises from the assignor's continuing liability to the lessor under privity of contract while the assignee is liable through privity of estate. *Id.* While the release of the principal, here Price, would normally release the surety unless there was an express reservation of rights, Restatement of Security § 122, a release of the surety has no effect upon the principal's obligation except as a satisfaction. The surety then can collect reimbursement from the principal (transferee) through subrogation. *Id.*, §§ 104, 141; *see also* Restatement (Second) of Property § 16.1, comment c.

 In conclusion, Cox and Price simply are not co-obligors in the common-law sense, and therefore the question of the release of one co-obligor serving as the release for all, as required by the common law, does not even arise. *See* J. Calamari & J. Perillo, Contracts §§ 20–1, 20–2, 20–3(e) (1977).[15]

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.[16]

---

**15.** Of course, Price may be entitled to a setoff of any amount paid by Cox in satisfaction of claims for which Price was held liable. *Cf. Lee v. State*, 490 P.2d 1206, 1211 n.16, 1212 n.21 (Alaska 1971) (amounts received by plaintiff from prior judgment for same injury are to be credited against damages assessed against defendants).

**16.** Price also attacks the award of attorney's fees to Fuller pursuant to the schedule in Civil Rule 82(a)(1). He contends that the superior court erred in awarding fees to Fuller under the Rule 82(a)(1) schedule without determining whether the award exceeded actual fees incurred. Because of our decision, the underlying damages award will be reduced and the attorney's fees must then be vacated and recalculated. We therefore do not decide whether the superior court abused its discretion in making the award.