**URSIN SEAFOODS, INC., Appellant,**

v.

**KEENER PACKING COMPANY, INC. and Arthur Amys, Appellees.**

**No. S–1584.**

Supreme Court of Alaska.

Sept. 4, 1987.

James D. Rhodes and Wevley William Shea, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellant.

George M. Kapolchok, Gary M. Guarino, Atkinson, Conway & Gagnon, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal is from a judgment entered after a trial awarding damages to Keener Packing Co., Inc. (Keener) in compensation for the breakdown of a fish processing barge it had chartered from Ursin Seafoods, Inc. (Ursin). The issues presented by this appeal are the proper interpretation to be given the language of the charter agreement and the propriety of the attorney's fees and costs award. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1984 Keener entered a contract to purchase salmon in Bristol Bay which it planned to process using a floating processor and its plant in Kenai. Keener entered agreements with Ursin to charter a fish processing barge, the Great Alaskan, and to purchase a landing craft, the Miss Piggy. In addition, the parties reached collateral agreements with regard to repair and preparation work which was to be done on the Great Alaskan before the charter began.

The charter was for a period of 90 days, beginning around June 5, 1984, at a rate of $2,000 per day.

Three of the charter agreement provisions are particularly relevant. First, the charter agreement provided that before the charter began Ursin and Keener would "thoroughly inspect the vessel including whatever [Keener] feels is necessary to determine that all equipment is operational to [Keener's] satisfaction," that Ursin would "have a maximum of 10 days to remedy any deficiencies noted during this inspection," and that the charter period would begin after correction of deficiencies.

The agreement also provided:

Charterer warrants that as of the signing of this agreement, he has inspected the vessel and deems it in all respects adequate for his intended purposes and holds owner harmless regarding all claims and disputes that might arise from representations as to the performance and or suitability of the vessel.

An additional provision of the charter agreement here in question provides:

In the event a major breakdown occurs where it becomes impossible to continue operating, charterer will do everything possible to put the equipment back in working order and owner agrees to assist as necessary. If 48 hours after owner is notified, vessel is still inoperable and the cause of the breakdown is determined by a qualified marine surveyor, selected by owner, to have occurred by no fault of the charterer, charter fee will cease to accrue from the time the 48 hour period lapses until the repairs are made. Charterer will present expenses incurred to owner at end of charter for settlement. If it is determined that the breakdown is a result of an accident or negligence on the part of the charterer, the charter fee will continue to accrue uninterrupted [sic] and charterer will bear all repair expenses.

Arthur Amys, Keener's President, inspected the Great Alaskan prior to executing the charter agreement.

Keener and Ursin also entered a side oral agreement that Keener personnel would repair storm damage to the Great Alaskan to prepare it for the charter. The main damage to be repaired by Keener was to the mobile homes on the deck that were to serve as the crew's living quarters. Keener personnel began making repairs in late May, after the charter agreement had been executed.

Keener also hired a chief engineer, Gary Flatt, who had been Ursin's chief engineer on the Great Alaskan the previous fishing season. Beginning around May 20, Flatt worked on the vessel's engines, preparing them for the charter. He found the starboard engine to be weak and strongly recommended that it be overhauled. Keener employee Michael Sawinski expressed this concern to Ursin's Kodiak general manager Charles Beach.

Beach suggested that Sawinski get a written bid on the cost of the repair to the starboard engine. Sawinski obtained a bid from Ben Everidge, a diesel mechanic who was working on the port engine. Everidge recommended that an in-frame overhaul be done, and prepared an estimate.

Beach was himself concerned and called Ursin's Seattle office since he did not have authority to go forward with such a major repair. He told Mike Samsel, Ursin's Vice President, that the engine needed work. Samsel said they would consider the request but denied it the next day. Sawinski testified that Beach told him Ursin did "not want to do anything about it. They will fix it when it breaks." [1] Norman Ursin, Ursin's president, testified that he had no knowledge of the request that the starboard engine be rebuilt and that he had heard only of a vague request for an engine rebuild kit. Norman Ursin stated that the request was denied because in the event such a kit were needed, someone else would have to go out to the barge to do the work anyway, "and at that time [Ursin] would do it."

The Great Alaskan left Kodiak for Bristol Bay on June 10, 1984. The repair work had not been completed and was continued en route to Bristol Bay. The trip to Bristol Bay took ten or eleven days. Keener then spent two days setting up its processing operation.

A few days after arrival in Bristol Bay, the Great Alaskan's generators began to experience repeated failures. First, the port generator began throwing sparks and the port engine was shut down so that Flatt could make repairs. Once Flatt got the port generator running, the starboard generator failed. Flatt and Sawinski spent 48 hours attempting to repair the starboard generator but were unsuccessful. Sawinski then flew to Kenai in an unsuccessful attempt to obtain a standby generator. Meanwhile, the turbo charger on the port engine failed and Flatt took the turbo charger from the non-functioning starboard engine and used it to get the port engine running again.

After Sawinski returned from Kenai, the port generator broke down and the Great Alaskan was without power for processing from June 30, 1984 until July 3, 1984. During this time, only the auxiliary generator was operational. It was too small to operate the fish processing equipment.

Keener notified Ursin of the generator breakdowns. A specialist, Forrest Hayden, was flown out to the vessel on July 2, 1984. Hayden determined that the port generator was defective. He also concluded that the generators had suffered mechanical damage due to improper long term maintenance. Not until the next day, July 3, was Hayden able to get the starboard engine and two of the three compressors running.

After Hayden's inspection, the parties decided to purchase two new generators. The port engine was brought on line on July 6. Finally, on July 8, both engines were back running three compressors at full power. But the generator problems

---

1. Ursin's position that Keener ignored the warnings from Flatt and Everidge about the starboard engine is not supported by the record. Ursin's own employee Beach testified that Keener requested the repair. The trial court likewise found that Keener had requested that work be done on the starboard engine but that Ursin refused.

had seriously disrupted Keener's processing operations.

The starboard engine failed completely that evening (July 8). Flatt determined that the engine seized due to a mechanical failure, as opposed to loss of oil, and concluded that the engine needed an overhaul.

Amys informed Ursin of the breakdown and that Keener would fly someone out to examine the engine. James Neff, a diesel mechanic, flew out to the vessel on July 10. Neff examined the engine and concluded that it needed a major overhaul. Neff did not determine the cause of the breakdown, but his findings indicated that there was oil in the engine and that this had not been added after the seizure.

Amys informed Samsel of Neff's report and the two argued over what was to be done. Keener then decided to terminate the charter. The Great Alaskan was towed to Kodiak, arriving August 4, 1984. From July 1 on, Keener had been able to process the fish it had on board sporadically and at a reduced rate using whichever engine was operating.

In May 1985, Ursin hired Dale Johnson, a marine surveyor, to inspect the Great Alaskan's engines. Johnson was unable to determine the cause of the engine failure. Norman Ursin conceded at trial that neither Johnson nor any other marine surveyor ever determined that Keener had caused the breakdown.

In September 1984, Ursin filed a complaint alleging that Keener was in breach of the purchase agreement for the Miss Piggy. Keener conceded that it had not made payments on the Miss Piggy but counterclaimed that any amount it owed was offset by amounts it was owed by Ursin under the charter agreement for the Great Alaskan. Ursin then amended its complaint, adding claims for breach of the charter agreement and damage to the Great Alaskan. After trial, Keener was awarded $234,648, offset by $60,000 for amounts it owed on its contract to purchase the Miss Piggy for a net award of $174,648. Ursin appeals the trial court's finding that it breached the implied warranty of seaworthiness and express provisions of the char-

ter agreement. It also challenges the attorney's fees and costs awarded to Keener. Because we find the record clearly supports the trial court's finding that Ursin breached express provisions of the charter agreement, we need not reach the implied warranty of seaworthiness issue.

## II. DISCUSSION

### A. BREACH OF CONTRACT.

The superior court found that Ursin breached the charter agreement. The court determined that Ursin had breached its duty under paragraph 2 to prepare the Great Alaskan for the charter. The court also found that Keener did not cause the breakdown and that Keener was entitled to recover its charter expenses and repair costs pursuant to paragraph 5 of the charter agreement.

#### 1. Standard of Review.

■ We will substitute our independent judgment when reviewing a trial court interpretation of a written contract based exclusively on documentary evidence, but we apply the "clearly erroneous" standard when the trial court has relied upon extrinsic testimonial evidence. *Kennedy Associates, Inc. v. Fischer*, 667 P.2d 174, 179 (Alaska 1983). A reviewing court is not to weigh conflicting evidence or assess the credibility of witnesses; these are functions peculiarly within the province of the trial court. *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980). In reviewing the trial court's interpretation of the contract, we view the facts in the light most favorable to Keener, as the prevailing party. *Wright v. Vickaryous*, 598 P.2d 490, 497 (Alaska 1979).

#### 2. Ursin's Duty to Make Pre-Charter Repairs.

■ Paragraph 2 of the charter agreement required Ursin and Keener to inspect the Great Alaskan and provided that Ursin would "remedy any deficiencies" that were discovered. Norman Ursin and Samsel admitted that Ursin agreed to put the vessel

in working order and that Ursin was required to correct any deficiencies.

While preparing the Great Alaskan for the charter, Keener requested Ursin to overhaul the starboard engine. Everidge, an independent mechanic, examined the engine and prepared an estimate for an "in-frame" overhaul. Despite its contractual obligation to "remedy any deficiencies," Ursin refused Keener's overhaul request. Ursin's manager, Beach, advised Keener that Ursin would fix the engine if and when it failed.

Norman Ursin's claim that an overhaul request was never made was contradicted by the testimony of several witnesses and was rejected by the superior court. Norman Ursin confirmed that Ursin's response to Keener was that if an overhaul became necessary during the charter Ursin would go out and do it.

> We were never told that that engine needed to be rebuilt. We were told that it would be nice to have these parts in case we needed out there. [sic] and *our response was to have the work done, somebody else would have to go out there anyway, and at that time we would do it.*

(Emphasis added).

Soon after the Great Alaskan arrived in Bristol Bay, it began experiencing engine problems which culminated in the seizure of the starboard engine on July 8. The superior court found that these breakdowns were due to inherent mechanical failure rather than Keener's alleged negligence. This finding is supported by the record.

Hayden reported that the generators had suffered mechanical damage and had failed due in part to poor long-term maintenance. Refuting Ursin's claim that the starboard engine seized because Keener negligently allowed it to run out of oil was testimony that the engine's oil and filters had just been changed in Kodiak, that the oil gauges were easy to monitor, and that Flatt had checked the oil just prior to the breakdown. Flatt testified that there was oil in the engine and that the seizure was due to mechanical failure. Neff's on-site inspec-

tion confirmed that there was oil in the engine when it seized. Keener presented evidence from several witnesses as to the engine's old age, weakness and history. The repair files indicated that the engine had not been rebuilt since before 1985. Moreover, Keener had only operated the engines for a short period before the breakdowns. There was evidence that the engine damage was due to faulty fuel injectors which may have been damaged prior to the charter by Ursin's water contaminated fuel.

Based on the above evidence, the superior court could properly find that the engine failure was not Keener's fault and that Ursin had breached its express obligation under paragraph 2 to ready the Great Alaskan and to remedy any deficiencies.

### 3. Termination of the Charter Because of Major Breakdown.

■ Paragraph 5 of the charter agreement defined the parties' duties and liabilities in the event the Great Alaskan suffered a "major breakdown." If the breakdown could not be repaired within 48 hours, and if the breakdown was not Keener's fault, then the charter fee would cease to accrue until repairs were made. Keener was to present to Ursin any expenses it incurred in attempting to repair the breakdown for settlement. If it was established that Keener's negligence caused the breakdown then the charter fee would not cease and Keener would bear any repair expenses.

The superior court found that 1) the Great Alaskan was significantly disabled from June 24 through July 8, 1984; 2) after July 8, with only one engine running, the processor was unable and unfit to freeze fish as intended; 3) Keener attempted to make repairs and notified Ursin of the breakdowns; and 4) the breakdowns were due to long-term poor maintenance and inherent mechanical failures, not to any improper maintenance or negligence by Keener. The court concluded that the charter fee terminated on July 10, 1984 (48 hours after the engine seizure), that Keener should recover two-thirds of the prepaid

charter and insurance fees, and that Ursin was liable for Keener's repair expenses and the damage to fish quality due to inadequate processing.

The superior court's findings are amply supported by the record. There is no dispute that the Great Alaskan suffered successive generator and engine failures. The breakdowns began around June 24 and the vessel was without any processing power from June 30 to July 3. For the remainder of the time from June 24 to July 8, the vessel ran only sporadically on half power with one generator and engine.

At trial, Sawinski testified that both engines were down and that there was no processing power from June 30 to July 3. Hayden, the generator specialist, stated that when he arrived on July 2, both engines were down and there was no power generation. The only power source during this period was the small auxiliary generator which could not run the processing equipment.

With regard to the issue of whether the generator and engine failures constituted a "major breakdown," Samsel, the drafter of paragraph 5, testified:

Q. Why don't you define for us, then, what you meant, subjectively, by minor mechanical breakdown? ...

A. It's not that easy a thing to define. There is [sic] some major pieces of equipment on there and there is [sic] major things that go wrong with them. An engine blows up, that's major if you can't get it running again.

The Great Alaskan was unable to process during the four days both generators were out and Keener's fish product was damaged as a result. During the rest of the time the vessel was running on a single engine, it was still not able to process adequately. Various witnesses testified that one engine could not adequately power the vessel's compressors. The seizure of the starboard engine on July 8 meant that Keener was faced with at least another 10 to 14 days of inadequate processing power. This delay was particularly significant given evidence that the red salmon season usually ran from around June 17 to July 20.

The undisputed testimony of several witnesses supports the trial court's finding that Keener made substantial efforts over two weeks to repair the engine failures. A specialist was flown out and new generators were purchased and installed. When the starboard engine seized, Keener contacted Ursin and another mechanic was flown out to examine the engine. Keener was then informed that the engine required a major overhaul. There was no evidence that Keener neglected or delayed repair efforts on the engines.

The testimony of numerous witnesses, including Ursin representatives, supports the court's findings that Keener notified Ursin of the breakdowns.

Finally, as discussed in the previous section, there was substantial evidence that the generator and engine breakdowns were not caused by Keener. Moreover, the superior court found that the charter required Ursin to choose a marine surveyor to establish Keener's negligence. Ursin's choice, Dale Johnson, could not conclude Keener was at fault.

Thus, the superior court properly concluded that major breakdowns occurred, terminating the accrual of the charter fee and entitling Keener to recover its charter fees and repair expenses pursuant to Paragraph 5 of the charter agreement.

## B. ATTORNEY'S FEES.

### 1. Actual vs. Partial Fees.

■ The charter agreement contained the following provision:

*Attorneys Fees.* In the event that any action is filed in relation to this agreement, the unsuccessful party in the action shall pay to the successful party a reasonable sum for the successful parties [sic] attorney's fees.

The trial court found that this provision mandated an award of actual, reasonable fees and awarded Keener $65,024. Ursin claims that the term "reasonable" in the above provision should be given the same

interpretation as in Civil Rule 82(a)(1) and that the trial court abused its discretion in awarding full instead of partial fees.

It is well established that " '[t]he purpose of Civil Rule 82 in providing for the allowance of attorney's fees is to *partially* compensate a prevailing party for the costs to which he has been put in the litigation in which he was involved.' " *Malvo v. J.C. Penney Company, Inc.*, 512 P.2d 575, 587 (Alaska 1973) *quoting Preferred General Agency of Alaska, Inc. v. Raffetto*, 391 P.2d 951, 954 (Alaska 1964) (emphasis supplied by *Malvo* court). But Ursin points to no evidence in the record that the parties intended to place a similar limitation on the contract provision, *i.e.*, that the provision was intended merely as a restatement of the rights the parties already possessed under Rule 82.

The trial court awarded fees based on the plain meaning of the contract provision independent of Rule 82. This was proper because, as in *Manson-Osberg Company v. State*, 552 P.2d 654, 660 (Alaska 1976), the contract provision must prevail over any limitations otherwise imposed by Rule 82.

### 2. Evidentiary Support for Amount of Fees.

Ursin also claims that Keener did not adequately document the amount of attorney's fees requested. Ursin incorrectly states that Keener failed to document the billing rates of, and hours worked by, Keener's attorneys on this case. While the documents originally submitted by Keener in support of its motion for fees listed only a description of work done and a total amount billed to the client, Keener submitted with its reply memorandum in support of its motion an affidavit setting forth the billing rates of and total hours worked by each of Keener's attorneys. Ursin apparently concedes the point since it does not make any attempt to claim that this affidavit is insufficient.

In any case, the documentation submitted by Keener was sufficient and the trial court did not abuse its discretion in awarding the amount of attorney's fees it did. *State v. Fairbanks North Star Bor-*

*ough Sch. Dist.*, 621 P.2d 1329, 1335 (Alaska 1981).

### C. COSTS.

 Keener correctly argues that Ursin may not now contest the amount of costs awarded since it failed to contest the amount at the superior court level as required by Civil Rule 79(d). *A.R.C. Industries, Inc. v. State*, 551 P.2d 951, 961 (Alaska 1976).

### III. CONCLUSION

The trial court correctly found that the starboard engine failure constituted a major breakdown entitling Keener to terminate the charter. The trial court's attorney's fees award was proper. Ursin may not now challenge the costs award.

AFFIRMED.