David A. KLOSTERMAN and
Frank Dahl, Appellants,

v.

HICKEL INVESTMENT COMPANY,
Appellee.

No. S–3560.

Supreme Court of Alaska.

July 19, 1991.

Rehearing Denied Aug. 23, 1991.

Peter W. Giannini, Giannini & Associates, Anchorage, for appellants.

Donald D. Hopwood and David J. Schmid, Kay, Saville, Coffey, Hopwood & Schmid, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal arises from Hickel Investment Company's (HIC) action to recover rent and possession of premises leased to Keystar, Inc., a/k/a Doubleday's, Inc. (Doubleday's), a corporation owned and operated by appellants David A. Klosterman and Frank Dahl. The superior court found that HIC's re-entries of the premises on November 27 and December 15, 1987, were in compliance with the lease agreement between the parties. It then determined that Doubleday's anticipatorily breached the agreement and awarded HIC lawful possession of the premises as well as all rent due over the ten year term of the lease. The court also awarded HIC the improvements and chattels remaining on the premises after February 1, 1988, the date Doubleday's abandoned the property. Klosterman and Dahl, the guarantors of Doubleday's' obligations under the lease, appeal. They additionally appeal a district court order granting HIC an ex parte writ of attachment as well as the district court's finding that HIC's manner of executing on an aircraft owned by Klosterman was permissible.

We affirm the superior court's order regarding Doubleday's' anticipatory repudiation of the lease. We reverse its findings regarding HIC's re-entries, its award of accelerated rent and its disposition of the property remaining in the leased premises, and we remand the case to the trial court for reconsideration of these issues. We further affirm the district court's order issuing an ex parte writ of attachment, but reverse its decision validating HIC's execution procedure on Klosterman's aircraft.

### I.

On October 9, 1986, Keystar, Inc., a/k/a Doubleday's, Inc.,[1] entered into a ten year lease of commercial space in the Fifth Avenue Building in Anchorage for the purpose of operating a bar and restaurant called "Doubleday's." David A. Klosterman and Frank Dahl, the two shareholders and principals of Doubleday's, each personally guaranteed the lease.

HIC purchased the Fifth Avenue Building in July 1987. In that transaction, the Doubleday's lease and the personal guarantees of Klosterman and Dahl were assigned by the prior lessor, Anders Corporation, to HIC.[2] During the closing, HIC learned that Doubleday's was having difficulty meeting its rental obligations and that it was, in fact, delinquent with its rent. HIC agreed to reduce Doubleday's' rent by $2000 per month for the year July 1987 through June 1988.

Due to ongoing delinquencies in the Doubleday's account, HIC's credit manager sent Doubleday's a letter on November 10, 1987, which demanded payment of all accrued rent and stated HIC's intention to re-enter the property pursuant to the default remedies set forth in the lease if the accrued rent was not paid by November 25.

---

1. Klosterman and Dahl apparently intended to change the name of the tenant corporation from Keystar, Inc. to Doubleday's, Inc. The corporation signed a number of documents using the Doubleday's name. However, the principals never officially changed the corporation name. HIC has brought suit only against Klosterman and Dahl individually.

2. Anders Corporation held a master lease on the Fifth Avenue Building and actually sublet to various tenants such as Doubleday's. For convenience, the agreement between the parties is called a lease.

After receiving a partial rent payment of $2500, HIC sent a second letter on November 24 which restated its intention to commence default remedies unless the account was made current.

Having received no further payments, HIC re-entered the premises on November 27, changed the locks and turned off the natural gas. . Klosterman later re-entered the premises and resumed operations, although the kitchen was not operable since there was no gas.

On November 30, Klosterman and Dahl met with HIC. At this meeting, HIC agreed to allow Doubleday's to remain in possession of the premises. It also agreed to restore the gas service to the property.

However, although Doubleday's made a partial rent payment on December 4, it failed to pay the full rent which became due on December 1. HIC apparently learned on December 9 that Doubleday's did not have any public liability insurance on its operations as required by the lease. On December 10, it initiated this action to recover rent and possession of the premises.

Following a second unsuccessful HIC attempt to lock Doubleday's out of the building on December 15, Doubleday's sought protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 (1988). The bankruptcy court ordered Doubleday's to pay HIC $1600 by January 29, 1988, and to obtain $200,000 in additional liability insurance by February 1.[3] If it could not comply with both of these obligations, Doubleday's was to vacate the premises and return possession to HIC.

Doubleday's was unable to comply with the bankruptcy court's order, and it ceased operations on January 31, 1988. Doubleday's agents then began removing property from the premises. However, HIC soon intervened, requesting that Klosterman and Dahl stop removing property. After discussion, the parties agreed that HIC would employ a security guard to assure

that neither HIC nor Doubleday's employees removed other items from the bar.

At a February 2 meeting, the parties were unable to arrive at an agreement regarding the property remaining in the bar. On February 3, HIC filed an ex parte motion for a prejudgment writ of attachment in the amount of the accrued rent plus interest, costs and attorney's fees. Although counsel for Klosterman and Dahl objected to the ex parte nature of the proceeding and demanded a continuance, the district court granted HIC's motion. HIC later levied on an aircraft registered in the name of David Klosterman by removing and storing the aircraft's engines, propellers, radio and cowlings.

In August 1988, HIC amended its complaint, seeking rent accrued through August 31, 1988. It also moved to increase the prejudgment writ of attachment to $107,557.73 to reflect Klosterman and Dahl's liability through September 30, 1988. The superior court granted HIC's motion.

This matter came to trial on May 30, 1989. The trial court determined that both the law and the lease permitted HIC's re-entry actions in response to Doubleday's' default, that Klosterman and Dahl were liable for rent over the entire term of the lease on an accelerated basis, and that HIC was entitled to property left on the premises after February 1, 1988. The court then entered judgment against Klosterman and Dahl in the principal amount of $735,789.12.

Klosterman and Dahl appeal the superior court's rulings. They also appeal the district court's order granting HIC an ex parte writ of attachment and its finding that HIC's execution on the aircraft parts was permissible.

## II.

We will not set aside a lower court's factual findings unless they are clearly erroneous. A clearly erroneous

---

**3.** Doubleday's had obtained $300,000 of insurance coverage prior to the time it filed for bankruptcy.

finding is one which leaves this court with "a definite and firm conviction on the entire record that a mistake has been made." *Parker v. Northern Mixing Co.*, 756 P.2d 881, 891 n. 23 (Alaska 1988). In reviewing factual findings, we must view the evidence in the light most favorable to the prevailing party below. *Id.*

We generally review questions of law *de novo*. *Langdon v. Champion*, 745 P.2d 1371 (Alaska 1987). However, although we will apply our independent judgment to a trial court's interpretation of a written contract based exclusively on documentary evidence, we will apply the clearly erroneous standard when the trial court has relied on extrinsic testimonial evidence. *Ursin Seafoods v. Keener Packing Co.*, 741 P.2d 1175, 1178 (Alaska 1987).

### III.

Klosterman and Dahl first argue that HIC's sole recourse for Doubleday's' failure to pay rent was to bring a forcible entry and detainer action under AS 09.45.-070(a).[4] However, the language of AS 09.-45.690 expressly retains a landlord's self-help remedy, and we therefore reject this claim. Alaska Statute 09.45.690 provides in relevant part:

> Unless otherwise provided in the lease, *a landlord has a right to re-enter leased premises when a tenant fails to pay rent,* and may bring action to recover the possession of the premises and the action is equivalent to a demand of the rent.

(Emphasis added.) Although the statute refers to a landlord's right to initiate judicial action, it clearly does not make such action mandatory.[5]

Alaska case law further supports a lessor's right to re-enter leased premises when a lease agreement provides for such action. *E.g., Klinger v. Peterson*, 486 P.2d 373 (Alaska 1971); *King v. Petroleum Ser-*

*vices Corp.*, 536 P.2d 116 (Alaska 1975). There is no dispute that the Doubleday's lease expressly permits the lessor to re-enter the property upon the lessee's failure to pay rent. Klosterman and Dahl's claim on this issue is therefore without merit.

Klosterman and Dahl next argue that, even if HIC lawfully could seize the premises without a court order, its conduct violated the default and re-entry provision of the lease. Specifically, they claim that HIC failed to give sufficient notice of its intention to re-enter the bar before doing so on November 27 and again on December 15, 1987.

The default and re-entry provision of the lease provides for re-entry upon Doubleday's' failure to pay rent. It states in relevant part:

> If any rents above reserved, or any part thereof, shall be and remain unpaid when the same shall become due, or if Lessee shall violate or default in any of the agreements herein contained, then the Lessor may at its sole option, upon fifteen (15) days written notice to Lessee, elect to (1) cancel this Lease or (2) without cancellation, re-enter said premises for the purpose of reletting.... Lessee agrees to vacate the premises within said ten (10) day notice period except that such notice need not be given in case of emergency. Said notice shall be deemed a notice to quit pursuant to AS 09.45.110. Abandonment by Lessee shall be deemed a default for which no notice of re-entry is required.

First, we observe that the lease contemplates a fifteen day notice period before the landlord may invoke the remedies set forth in the agreement, but it then refers to "said ten (10) days notice." Due to the reference to two different notice periods, we will review this case applying a fifteen day notice requirement.[6] Based on the

---

4. That statute provides, "When a forcible entry is made upon a premises, or when an entry is made in a peaceable manner and the possession is held by force, the person entitled to the premises may maintain an action to recover the possession." AS 09.45.070(a).

5. We note, however, that any self-help action must conform to the requirement of AS 09.45.-060 regarding entry in a peaceable manner and without a breach of the peace.

6. The reference to two different notice periods creates an ambiguity in the lease contract. *See O'Neill Investigations v. Illinois Employers Ins. of*

record before us, we conclude that HIC failed to give Doubleday's sufficient notice of its intention to re-enter the premises on both November 27 and December 15.

With regard to the November 27 re-entry, Doubleday's received HIC's first letter, notifying it of HIC's intention to re-enter the premises, on November 12, 1987.[7] Viewing the facts in the light most favorable to HIC, its re-entry therefore occurred on the fifteenth day after Doubleday's received notice.[8] On that date, Doubleday's still had one day to cure its default under the terms of the lease.

The trial court did not adopt this view of the case. We therefore remand the issue of HIC's insufficient notice to that court with instructions to fashion a remedy adequately compensating Doubleday's for HIC's premature re-entry. Because HIC substantially complied with the terms of the lease, however, we note that the remedy for HIC's early entry may be nothing more than a one day abatement of rent. That is, unless Doubleday's can show it would have cured its arrearage on the fifteenth day of notice, it is unlikely to have incurred any significant harm due to HIC's action.

■■■ We similarly remand the issue of HIC's December 15 re-entry for consideration of an appropriate remedy. In spite of HIC's argument that an emergency situation justified its action on that day since it had recently learned that Doubleday's held no public liability insurance, the trial court failed to articulate a factual basis for concluding that an emergency existed. The record and findings are not adequate to determine whether the failure to maintain insurance as required by the lease rises to the level of emergency as contemplated by the parties at the time they entered into the lease agreement.[9]

At most, HIC's institution of this action on December 10, 1987, serves as notice of its intention to re-enter the premises a second time. Thus, the December 15 re-entry did not comply with the fifteen day notice period required by the lease. On remand, the trial court is instructed to formulate a remedy which appropriately compensates Doubleday's for HIC's conduct. In so doing, it may reevaluate Klosterman and Dahl's contention that HIC's action breached the covenant of quiet enjoyment contained in the lease.

## IV.

The superior court concluded that HIC had not terminated the lease even after Doubleday's abandoned the premises; therefore, Doubleday's had anticipatorily repudiated the agreement. It then found Klosterman and Dahl liable for Doubleday's' rent, including accelerated future rent due over the ten year lease term.

Klosterman and Dahl argue that HIC terminated the lease, thus terminating their obligation to pay rent. They contend that HIC accepted Doubleday's' offer of surrender by taking possession of and occupying the premises for its own uses. They also contend that the court's ruling improperly accelerates the rent owed by

*Wausau,* 636 P.2d 1170, 1174 (Alaska 1981) (an ambiguity exists when a contract is reasonably subject to differing interpretations). Applying an established rule of contract construction, we will construe the ambiguity against the party that supplied the contract. *Wessells v. State, Dep't of Highways,* 562 P.2d 1042, 1050 (Alaska 1977). In this case, the lessor provided the lease form; we will therefore resolve the ambiguity in favor of the lessee, Doubleday's.

7. The November 10 letter stated that unless HIC received the rent in arrears by November 25, 1987, HIC would "impose that portion of [Doubleday's'] lease which pertains to default remedies, specifically, paragraph 23; election (2), re-enter said premises for the purpose of reletting."

8. At trial, it was contested whether HIC actually re-entered the premises on the evening of November 26 or on the morning of the 27th.

9. We further reject HIC's argument that its November 24, 1987 letter constituted notice that a continuing rent arrearage would result in a second re-entry. The November 24 letter preceded HIC's first re-entry. Although it clarified that HIC's acceptance of a partial rent payment would not affect HIC's intention to re-enter the premises as indicated in the earlier November 10 letter, the second letter does not constitute notice of HIC's intention to re-enter the premises yet another time following the November 27 entry.

Doubleday's in the absence of any agreement between the parties to do so.

A tenant does not end his or her obligation to pay rent by abandoning leased property unless the landlord accepts what is, in effect, the tenant's offer to surrender the leased property, thereby terminating the lease. If a tenant abandons leased property and the landlord takes possession and occupies it for his or her own purposes, such retaking constitutes an acceptance of the tenant's offer of surrender, and the lease is terminated. Restatement (Second) of Property § 12.1 comment i (1977); *see also Price v. S.S. Fuller, Inc.,* 639 P.2d 1003, 1005 (Alaska 1982) (termination of a lease relieves tenant of the duty to pay rent). A lessor's re-entry into leased premises following a breach by the lessee, however, does not, in itself, necessarily result in a termination of the lease. *King v. Petroleum Services Corp.,* 536 P.2d 116, 120 (Alaska 1975) (citing *Coffin v. Fowler,* 483 P.2d 693 (Alaska 1971)). The landlord's intentions regarding termination, as well as other significant indicia of termination, must be examined before such a conclusion is warranted. *See King,* 536 P.2d at 120.

It is clear that HIC had not terminated the lease prior to Doubleday's' abandonment of the premises. Following the abandonment, HIC took possession of the property and used it for its own benefit in some small manner.[10] However, applying the clearly erroneous standard and viewing the facts in the light most favorable to HIC, *Parker v. Northern Mixing Co.,* 756 P.2d 881 (Alaska 1988), we affirm the superior court's finding that HIC's actions did not constitute acceptance of Doubleday's' offer of surrender.[11] For this reason, we agree with the court's determination that

Doubleday's anticipatorily repudiated the agreement.

We do not agree, however, with the court's decision to accelerate the rent due over the full term of the lease. In interpreting lease agreements, we must give effect to the reasonable expectations of the parties. Where a contract provision is unambiguous, we will ascertain the parties' intention from the instrument itself. *Port Valdez Co. v. City of Valdez,* 437 P.2d 768, 771 (Alaska 1968).

The default and re-entry provision of the lease clearly identifies HIC's remedy upon Doubleday's' default when HIC has elected to re-enter the premises for purposes of reletting. It provides in relevant part:

> If any rents above reserved, or any part thereof, shall be and remain unpaid when the same shall become due, or if Lessee shall violate or default in any of the agreements herein contained, then the Lessor may ... without cancellation, re-enter said premises for the purpose of reletting; but notwithstanding such re-entry by Lessor, *the liability of the Lessee for the rent provided for herein shall not be extinguished for the balance of the term of this Lease, and Lessee covenants and agrees to make good to Lessor any deficiency arising from a re-entry and reletting of the premises at a lesser rental than herein agreed to. The Lessee shall pay such deficiency each month as the amount thereof is ascertained by the Lessor.*

(Emphasis added.)

Because the parties have contractually agreed that Doubleday's will pay the rent due HIC over the term of the lease *as it accrues,* we must give effect to the parties' agreement. This court has upheld rent

---

10. The record reveals that HIC posted a security guard to restrict Doubleday's' ability to remove property from the premises. It also temporarily used the space for storage and allowed construction workers to cut sheetrock and other materials on the premises. HIC additionally allowed employees from adjacent offices to use the lavatories, for which Doubleday's' rent paid lighting, service and maintenance expenses.

11. The court's conclusion is supported by the default and re-entry clause of the lease. Under that provision, abandonment by the lessee is "deemed a default for which no notice of re-entry is required." Pursuant to this clause, re-entry could be accomplished for the purpose of reletting without cancelling the lease and without extinguishing the lessee's obligation to pay rent.

acceleration clauses in lease agreements when the parties to those agreements have expressly so provided. *E.g., Amick v. Metropolitan Mortgage & Securities Co.*, 453 P.2d 412 (Alaska 1969), *rev'd on other grounds, Wickwire v. Juneau*, 557 P.2d 783 (Alaska 1976). Absent an express provision in the lease for acceleration of unaccrued rent, however, it is improper for the courts to impose such a remedy.[12]

Rather than accelerating the rent due over the full term of the lease, the trial court properly should have ordered Klosterman and Dahl to pay the rent accrued at the time of trial, taking into account revenue received by HIC from its subsequent reletting of the premises. Then, in future months, Klosterman and Dahl must pay monthly any deficiency between Doubleday's' rental obligation and the revenue received from HIC's mitigation of its damages. Klosterman and Dahl, therefore, are only liable for rent as it actually accrues and as the deficiency, if any, is ascertained.[13] This remedy contemplated by the parties obviates the need to discount unaccrued rent to present value; it also accounts for revenue received by HIC from its reletting of the property.

For the reasons stated above, we therefore reverse the trial court's decision accelerating the rent due over the ten year term of the lease. We remand for calculation of the amount of rent accrued to the present date and for implementation of a rent schedule which allows Klosterman and Dahl to pay HIC the deficiency in rent due as each month's rent accrues until the end of the lease term.

**V.**

■■■ Klosterman and Dahl argue that the trial court clearly erred in finding that HIC was entitled to and owned all improvements and chattels remaining on the premises after Doubleday's vacated on February 1, 1988. The court was apparently persuaded by HIC's argument that it was entitled to retain possession of the property under the repairs, alterations and removal of property provisions of the lease.[14]

However, the three provisions of the lease on which the court apparently relied to award the property to HIC do not provide a basis for its decision. The lease's removal of property clause states as follows:

> In the event of any entry in, or taking possession of, the leased premises as aforesaid, the Lessor shall have the right, but not the obligation, to remove from the leased premises all personal property located therein, and may place the same in storage at a public warehouse at the expense and risk of the owners thereof.

This provision does not confer ownership rights in the lessee's property to HIC.

The repairs and alterations clauses do not support the court's decision for two reasons.[15] First, both provisions expressly apply only upon termination of the lease, and the court found there had been no termination. In addition, much of the property in question is neither a repair nor an alteration of the premises, but rather personal property.

12. *See Long Island R.R. v. Northville Industries Corp.*, 41 N.Y.2d 455, 393 N.Y.S.2d 925, 933 (1977); *Jordan v. Nickell*, 253 S.W.2d 237 (Ky. 1952) (acceleration of unaccrued rent after lessee's anticipatory repudiation held improper when the lease provided for payment of rent in fixed installments); *Cf.* Restatement (Second) of Property § 12.1 comment k (1977) (parties may provide in lease for acceleration of unaccrued rent over the entire term of a lease agreement).

13. In the event Klosterman and Dahl fail to pay the deficiency as required by the lease, HIC may choose to reduce their arrearage to judgment periodically.

14. At trial, HIC's only theories of ownership were based on those paragraphs of the lease.

15. The repairs clause provides in pertinent part: "Any and all improvements, reconditioning and remodeling, shall become the property of the Lessor upon termination of this Lease."

The alterations clause reads in part:
Except for emergency repairs, Lessee shall not make any change, alteration or addition to the premises, or any part thereof, without the consent of Lessor in writing, being first had and obtained. All improvements ... shall, unless otherwise agreed in writing, become the property of Lessor and shall remain in and be surrendered with the premises as part thereof at the termination of this Lease....

The trial court's ruling on this issue was in error and is therefore reversed and remanded.[16]

## VI.

 Klosterman and Dahl lastly contend that the district court erred in granting HIC's motion for an ex parte writ of attachment. Alaska Civil Rule 89(m) outlines the considerations governing issuance of an ex parte writ of attachment.[17] The court determined that HIC adequately established that Klosterman and Dahl were disposing or were about to dispose of property so as to defraud creditors. It therefore issued the ex parte writ.

On the record before us, it is a close question whether the requirements of Rule 89(m) were met. However, applying a deferential standard of review to the district court's decision, we conclude that the court did not abuse its discretion in granting HIC's request for an ex parte writ. The ruling is therefore affirmed.

 We next address Klosterman and Dahl's argument that HIC improperly executed on Klosterman's aircraft by removing its engines, propellers, radio and cowlings. Alaska Civil Rule 89(f) describes the procedure for proper execution of writs.[18] Because the aircraft was in the possession of a third party, we conclude that Rule 89(f)(3) governs HIC's conduct in executing on the airplane.

In order to comply with that subsection, HIC should have attached the airplane by leaving a certified copy of the writ with Alaska Bush Carriers, the third party in possession of the craft. It failed to do so, thereby failing to comply with the rule. We further conclude that HIC's conduct in dismantling the airplane exceeded the scope and the spirit of Rule 89(f); therefore, its actions were also unlawful in this regard.

HIC could have secured the airplane in the generally accepted manner of posting it with a copy of the writ and then chaining the propeller. It has failed to persuade us that the circumstances justified a more drastic mode of execution on the property. Because HIC has not made a persuasive showing that the removal of aircraft parts was necessary to protect its interest in the property, we find that its action exceeded the scope of Civil Rule 89.

For this reason, we reverse the district court's ruling on this issue, and we remand for consideration of Klosterman's damages, if any, sustained due to HIC's dismantling of the aircraft.

AFFIRMED in part, REVERSED in part and REMANDED.

---

**16.** On remand, the trial court may reconsider *Doubleday's' claim that HIC's possession of the property constitutes conversion* as well as any HIC claim to a lien or to the remedy of distraint which justifies its possession of the items in question.

**17.** The rule states:

> The court may issue a writ of attachment in an ex parte proceeding ... only in the following extraordinary situations:
>
> * * * * * *
>
> (2) *Imminence of Defendant Avoiding Legal Obligations.* The court may issue an ex parte writ of attachment if the plaintiff establishes the probable validity of his claim for relief in his main action, and if he states in his affidavit specific facts sufficient to support a judicial finding of one of the following circumstances:
>
> * * * * * *
>
> (v) The defendant is otherwise disposing, or about to dispose, of the property in a manner

so as to defraud his creditors, including the plaintiff.

Alaska R.Civ.Proc. 89(m).

**18.** Rule 89(f) states in pertinent part:

> (2) Personal property capable of manual delivery to the peace officer, and not in the possession of a third party, shall be attached by the peace officer by taking it into his custody.
>
> (3) Other personal property shall be attached by leaving a certified copy of the writ, and a notice specifying the property attached, with the person having possession of same, or if it be a debt, then with the debtor.