In re WOLVERTON
ASSOCIATES, Debtor.

WICKLAND OIL COMPANY,
Appellant,

v.

OFFICIAL CREDITORS'
COMMITTEE, Appellee.

No. 88–15747.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1990.

Decided July 25, 1990.

James C. Collins, Thelen, Marrin, Johnson, and Bridges, San Francisco, Cal., for appellant.

Sarah K. Hofstadter and Bernard Burk, Howard, Rice, Nemerovski, Canady, Robertson, & Falk, San Francisco, Cal., for appellee.

Before CHOY, THOMPSON and TROTT, Circuit Judges.

## OVERVIEW

CHOY, Circuit Judge:

This case involves a dispute among creditors of Wolverton Associates. The Official Creditors' Committee ("Committee") contended at trial that the appellant creditor, Wickland Oil Company ("Wickland"), engaged in a course of conduct that allowed it to receive a postpetition transfer of Wolverton Associates' interest in property located in Vacaville, California. The Committee asserted that the leasehold had a bonus value of approximately $100,000.00. Additionally, the Committee averred that Wickland acted in conscious disregard of the rights of the other creditors, thereby justifying the imposition of punitive damages.

Appellant Wickland argued that Wolverton Associates legally surrendered its leasehold interest prior to the filing of the involuntary bankruptcy petition. Thus, the proceeds Wickland received were from the individual owners of the property, who had personally guaranteed the payment of Wickland's account. Further, Wickland contended that even if a voidable postpetition transfer had occurred, the bonus value of any leasehold interest Wolverton Associates had in the property was worth at most $17,000.00. Wickland also argued that its conduct did not justify imposing punitive damages.

The bankruptcy court decided in favor of the Committee. It held Wickland liable for actual damages of $100,000. It also awarded prejudgment interest in the amount of $31,811.11, and punitive damages in the amount of $50,000.00. Wickland appealed to a Bankruptcy Appellant Panel, which affirmed the bankruptcy court's decision. Wickland timely appealed to this court.

We affirm the bankruptcy court's finding that there was a voidable postpetition transfer. We reverse the court's damages determination, however, and remand with instruction to recalculate actual damages and prejudgment interest. The court should also reconsider its punitive damages

award in light of our decision and its recalculation of actual damages.

## FACTUAL AND PROCEDURAL BACKGROUND

In the late summer and early fall of 1981, Wolverton Associates, a gasoline and diesel retailing business owned by Charles Wolverton, his father's estate, his sister Ann Bernier and her husband Marcel Bernier, fell behind in paying its trade creditors. Among the creditors were Wickland Oil Company, and the companies that later became the members of the Committee: Golden Gate Petroleum Co., Getty Refining & Marketing Co.,[1] and G.N. Renn, Incorporated.

On September 10, 1981, representatives for Charles Wolverton and the Berniers arranged a meeting to discuss a possible workout of Wolverton Associates' debt. Representatives of the companies on the Committee attended, as well as Wickland's credit manager, John Masterson, and Wickland's outside collection counsel, Jerrold B. Braunstein. At the meeting, Charles Wolverton and the Berniers proposed a plan to use their personal and business assets to pay off Wolverton Associates' debts. The assets they proposed to use included any proceeds from a planned sale or lease of a gas station in Vacaville, California, which Wolverton Associates had been operating since 1977. The creditors, however, did not accept the proposal.

On November 10, 1981, representatives of the various creditors met to discuss the problem of the outstanding indebtedness of Wolverton Associates. Mr. Masterson and Mr. Braunstein attended on behalf of Wickland. The representatives agreed to have Braunstein file a petition for involuntary bankruptcy in the Sacramento Bankruptcy Court on behalf of three petitioning creditors: Wickland, Golden Gate, and Getty.

Venue for the involuntary bankruptcy would have been proper in either San Jose or Sacramento. The creditors decided to

---

1. Texaco subsequently acquired Getty, but the company was "Getty" at the time of all relevant events.

file in Sacramento primarily because the docket of the Sacramento court was less crowded, and the creditors wished to move the bankruptcy along as rapidly as possible. Wickland's representatives concurred, and all those present understood and agreed that Braunstein would proceed accordingly.

Braunstein had represented Wickland in collection matters on a regular basis since 1975. He had already filed suit on behalf of Wickland against Wolverton Associates and its guarantors for the Wickland account (Charles Wolverton and the Berniers) in Yolo County Superior Court on August 21, 1981. On October 14, 1981, the court in the Yolo County lawsuit issued Wickland a writ of attachment against three properties; one of these was the Vacaville service station run by Wolverton Associates. Record title was held by Charles Wolverton and the Berniers. Wolverton Associates had no recorded interest in the property, although it actually held a long term lease with a fixed monthly rent. On October 30, Wickland filed the writ of attachment in Solano County, the site of the Vacaville property.

Mr. Braunstein filed an involuntary bankruptcy petition against Wolverton Associates on November 25, 1981. Braunstein did not serve Wolverton Associates or Charles Wolverton and the Berniers with the petition or in any other manner inform them that the petition had been filed. Despite attempts by representatives of Golden Gate and Renn to ascertain the status of the matter during November and December, 1981, Braunstein did not inform any of the other creditors that the petition had been filed until after December 31, 1981. On December 16, 1981, Braunstein had a conversation with Cynthia Leahy, an attorney for Golden Gate, that led her to believe that the petition had not yet been filed.

On November 30, 1981, Braunstein filed a request for appointment of an interim trustee without notice. The order granting the request was not signed by the court or filed until December 30, 1981. Braunstein did not inform Charles Wolverton or the Berniers, or any of the other creditors, that a trustee had been appointed until after December 31.

The Vacaville property had been listed for sale since the spring of 1981. On October 15, 1981, a Mr. and Mrs. Obermuller entered into a binding purchase agreement with Charles Wolverton and the Berniers, subject to the Obermullers obtaining an acceptable lessee. This "new lessee" requirement was apparently nothing more than an inartful way to say the property would be sold free and clear of the existing lease. In early December, 1981, Braunstein learned of the sale of the Vacaville property and that Wickland's attachment lien was an obstacle to the closing of escrow on the sale.

Wickland indicated to Charles Wolverton and the Berniers, through Braunstein, that only upon payment in full of Wolverton Associates' obligation to Wickland would the company release its lien. On December 30, 1981, Braunstein tendered into the Vacaville escrow a dismissal with prejudice of Wickland's Yolo County suit conditioned on payment of $108,430.27 from the proceeds of the sale. Escrow closed on December 31, 1981; on January 5, 1982, Wickland received from Braunstein a check for $98,-430.27, representing Wickland's claim against the individual guarantors, plus interest, less $10,000 for attorney fees.

*Relevant History of The Vacaville Station*

In 1977, Charles Wolverton and the Berniers noticed the Vacaville property, which had an old gas station on it, and thought it would be a good site for one of their stations. Unable to afford the property at the time, however, they approached a Dr. Lager and a Dr. Shimoff about their purchasing the property and leasing it to Wolverton Associates.

Lager and Shimoff accepted the proposal, purchased the property, and leased it to Wolverton Associates. The original lease contained an option for the the lessee to purchase the property after three years. Ten days before the execution of this lease, the City of Vacaville issued a conditional use permit to the owners for the operation of Wolverton Associates' service station on the condition that the owners dedicate to

Vacaville the "improved, unnamed stub street on the western portion of the site." Nine years earlier, a book of parcel maps in the Official Records of Solano County contained a map labelling this same portion of the Vacaville property a "future street." At all times since August, 1977, the western third of the property was a fully paved and improved "stub" street.[2]

In December, 1980, Charles Wolverton and the Berniers purchased the property as individuals from Lager and Shimoff. In May, 1981, they executed a new lease with their family-held corporation, Wolverton Associates. The new lease term was for a period of five years with an option to renew on the same terms for five additional years. The lease had a fixed monthly rent of $2,000.00. The parties did not record the lease.

Wickland knew, however, that the property had been operated by Wolverton Associates as a gas station because it was Wolverton Associates that had been purchasing gasoline products from Wickland for the station. Wickland also knew that Wolverton Associates operated some gas stations on properties it leased from other persons. Wolverton Associates' financial statement, a copy of which was sent to Mr. Masterson with the proposed workout agreement in September, 1981, indicated that Wolverton Associates was paying rent on the Vacaville property. Finally, the fact that the Vacaville property was being leased to Wolverton Associates by Charles Wolverton and the Berniers had been mentioned at the September 10, 1981 proposed workout meeting. Wickland took no steps to investigate whether Wolverton Associates had any right of occupancy or leasehold interest in the property prior to accepting payment of Wolverton Associates' debt from the proceeds of its sale.

*Proceedings Below*

Wolverton Associates was not aware of the filing of the involuntary petition until shortly before March 10, 1982. On that date, Mr. Harward, the attorney for Wol-

verton Associates, wrote to Braunstein and demanded that Wickland return to the Debtor's estate the funds Wickland had realized from the sale of the Vacaville property. Wickland refused to return the funds in response to this and subsequent demands, and has never returned any portion of those funds.

Shortly after Wolverton Associates learned about the involuntary bankruptcy, the case was converted into a Chapter 11 case by stipulation, and transferred to the bankruptcy court in San Jose. At that point Wolverton Associates, as debtor in possession, replaced the trustee as manager of the estate. Appellee Committee was subsequently given leave of court to pursue an adversary proceeding against Wickland on the estate's behalf.

The bankruptcy court decided in favor of the Committee. It held Wickland liable for actual damages of $100,000.00 on four independent, alternative theories:

(1) Wickland received a postpetition transfer of the value of Wolverton Associates' leasehold interest in the Vacaville property from the proceeds from the sale of the property, which was worth approximately $100,000.00. The bonus value was based on a finding that Wolverton Associates had a right to use the entire square footage under the lease, and that the entire parcel had a market value of 10.5 cents per foot, per month.

(2) Wickland breached its duty to the other creditors and was thus liable for an amount equal to the value of Wolverton Associates' leasehold interest, or $100,000.00.

(3) The sale of the Wolverton Associates' interest in the Vacaville property constituted a fraudulent conveyance, and Wickland was the recipient of the proceeds from this fraudulent conveyance.

(4) Wickland was in possession of the proceeds from the sale of Wolverton Associates' leasehold interest, and was required to turn over the proceeds pursuant to Section 542 of the Bankruptcy Code.

---

**2.** A "stub" street is essentially a "dead-end" street, or one that connects only to a connecting street at one end.

Finally, the bankruptcy court awarded prejudgment interest in the amount of $31,-811.11, and punitive damages in the amount of $50,000.00.[3] Wickland appealed to a Bankruptcy Appellant Panel, which affirmed the decision of the bankruptcy court. Wickland timely appealed to this court.

## STANDARDS OF REVIEW

■ We independently review the decisions of Bankruptcy Appellate Panels. *Probasco v. Eads (In Re Probasco)*, 839 F.2d 1352, 1353 (9th Cir.1988). We review the bankruptcy court's findings of fact using the clearly erroneous standard and its conclusions of law de novo. *Id.* at 1353–54.

■ When the trial court's findings are adopted from the proposed findings of fact and conclusions of law of the winning party (even verbatim), the clearly erroneous standard still applies. *Anderson v. City of Bessemer City*, 470 U.S. 564, 571–72, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Cooling Sys. & Flexibles v. Stuart Radiator, Inc.*, 777 F.2d 485, 487 (9th Cir.1985). We affirm a bankruptcy court's factual findings and inferences unless, after reviewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## DISCUSSION

### I.

*Postpetition Transfer*

The bankruptcy court held that Wickland's receipt of a large portion of the cash proceeds from the sale of the Vacaville property constituted a voidable postpetition transfer of the value of Wolverton Associates' leasehold interest in the property under 11 U.S.C. § 549. The bankruptcy court also ruled for the Committee on several alternative, independent theories, but liability under each of the rulings depends on

the court's factual finding that Wolverton Associates did not surrender (by operation of law or otherwise) its leasehold interest in the Vacaville property prior to the filing of the involuntary bankruptcy petition.

Appellant Wickland asserts that any leasehold interest Wolverton Associates had in the property it surrendered on or shortly after October 16, 1981, the date Charles Wolverton and the Berniers executed a sale contract that required:

Buyers to arrange a satisfactory lease agreement within ten (10) days from acceptance of this offer.

The owners of the property were the sole officers and directors of Wolverton Associates. Wickland therefore contends that the act of requiring the purchasers to obtain a new lessee necessarily implied that Charles Wolverton and the Berniers had their family-held corporation surrender its valuable leasehold interest back to them prior to the filing of the bankruptcy petition. Wickland did not point to this conduct at trial merely as evidence of an intended surrender, however. Rather, it claimed that this conduct was so unequivocally inconsistent with Wolverton Associates' leasehold interest in the property that it required the court to declare a surrender by operation of law. If a surrender occurred in October, 1981, then there was no postpetition transfer of Wolverton Associates' property.

The bankruptcy court held that the conduct of the parties, including the act of requiring the purchasers to obtain a new lessee, was not so unequivocally inconsistent with Wolverton Associates' interest in the property to effect a legal surrender as of the date of the contract. Nor did the court think that an actual surrender occurred.

■ California real property law applies to the surrender issue. Whether there has been a surrender, actual or by implication, is a question of fact. *Dorcich v. Time Oil Co.*, 103 Cal.App.2d 677, 682–83, 230 P.2d 10, 13 (1951). The bankruptcy court's finding that there was no intention-

---

**3.** Initially, the court awarded $100,000.00 in punitive damages, but it later reduced the amount to $50,000,00.

al or legal surrender is therefore subject to the clearly erroneous standard on review. *In Re Probasco*, 839 F.2d at 1355. We do not find the court's determination that no surrender occurred clearly erroneous.

■ Wickland is correct that *Welcome v. Hess*, 90 Cal. 507, 27 P. 369 (1891), succinctly states the doctrine of legal surrender:

[W]hile it is said that a surrender by operation of law is by acts which imply mutual consent, it is quite evident that such result is independent of the intention of the parties that their acts shall have that effect. It is by way of estoppel.

*Id.* at 512, 27 P. at 370. Wickland also properly quotes a leading real estate treatise:

Surrender results from an estoppel created by acts of the parties. Therefore, there may be an implied surrender when the conduct of the parties would not be valid unless the lease were considered terminated, so that they are estopped to dispute that a surrender has resulted.

6 H. Miller & M. Starr, *California Real Estate*, § 18:128, at 368 (2d ed. 1989). Implied surrender is an estoppel doctrine. Thus, if a party reasonably relies on conduct which implies mutual consent to a surrender a lease, that party may be entitled to estop either landlord or tenant from later claiming there was no surrender.

The doctrine of surrender by operation of law is usually invoked by a tenant or landlord, and occasionally by other parties who were aware of the acts in question and relied on them in some way. Wickland in this case attempts to employ the doctrine in a novel situation: it received proceeds from the sale of premises leased by Wolverton Associates, the corporation in debt to Wickland, but owned by Charles Wolverton and the Berniers, who were the guarantors of Wolverton Associates' debt to Wickland *and* the sole officers and directors of the lessee Wolverton Associates. Wickland never investigated whether Wolverton Associates had an interest in the property, nor was it aware of the terms of the sale contract. Thus Wickland invokes the implied surrender doctrine on the basis of conduct that it did not know about or rely on when it accepted payment from the guarantors; and the landlords in this case were also the owners and personal guarantors of the corporate tenant.

■ Wickland's lack of reliance calls into question the applicability of the legal surrender doctrine altogether, because a party invoking an estoppel doctrine must normally show reasonable reliance on the other party's conduct. *Nicholas v. Myers*, 112 Cal.App.3d 988, 992, 169 Cal.Rptr. 601, 604 (1980). If Wickland's lack of reliance does not prevent it from invoking the legal surrender doctrine, it at least makes it less likely that the equities of the case required the bankruptcy court to declare a legal surrender. In addition, the fact that the landlord and tenant were the same people in this case makes the significance of their conduct more ambiguous. Thus, it is more difficult to determine whether their conduct was "unequivocally inconsistent" with the tenant Wolverton Associates' interest in the property.

■ The court below held that the lease was in full force and effect up until the close of escrow, and that Wolverton Associates had a right to receive the value of the unexpired term of its leasehold interest out of the proceeds from the sale. Exactly when Wolverton Associates technically surrendered its possessory interest in the property is *not* clear. Strong arguments can be made that: (1) the "new lessee" provision in the sale contract effected a surrender of the leasehold estate in October, 1981, prior to the filing of the bankruptcy petition; or (2) Wolverton's leasehold estate lasted until the close of escrow on December 31, 1981, and thus beyond the November date the bankruptcy petition was filed. Applying the deferential clearly erroneous standard, we uphold the court's determination that the lease was in full force and effect for more than one month after the filing of the involuntary bankruptcy petition.

■ More importantly, however, we affirm as not clearly erroneous the bankruptcy court's finding that Wolverton Asso-

ciates had an interest in the proceeds from the sale of the Vacaville station equivalent to the bonus value of its lease agreement with Charles Wolverton and the Berniers. In other words, even if the evidence compelled a finding that Wolverton Associates had surrendered its possessory interest in the property prior to the filing of the bankruptcy petition, this would not necessarily indicate that it surrendered its interest in the property altogether. A lease is both a conveyance of an estate and a contract. The act of selling the property free and clear necessarily meant Wolverton Associates would not remain on (or return to) the property once the new owners were in place. Still, it is conceivable that the sale of the property consisted of a sale of the leasehold interest on behalf of the corporation and the fee interest on behalf of the individual owners.

Wickland insists that there is no evidence to support a "buyout agreement" between Charles Wolverton, the Berniers, and Wolverton Associates, whereby the individuals would sell on behalf of themselves and their family held corporation. Evidence of an explicit agreement would be important were it not for the fact that Wolverton and the Berniers wholly controlled Wolverton Associates. This fact makes it unlikely that the court would find such an agreement.

▇▇▇▇▇ Under the circumstances, the bankruptcy court did not have to find conclusive proof of an intent on the part of the individuals that they were selling the property partly on behalf of Wolverton Associates in order not to declare a legal surrender on Wickland's behalf. It is enough if the court found that the conduct of Charles Wolverton and the Berniers did not unequivocally indicate that they had their corporation surrender its valuable leasehold interest to them prior to the filing of the bankruptcy petition.

There appears to be ample support for this finding, and the record as a whole does not indicate otherwise. Wolverton Associates continued to pay rent on the property for several months after it ceased operating the gas station, and for at least three weeks after the supposed date of surrender. Charles Wolverton's testimony in the trial revealed an individual who did not always distinguish his personal actions from those taken on behalf of the family corporation.[4] Only when the distinction

---

4. Consider the following excerpt of Wolverton's testimony:

Committee: At the time of the September 10 meeting in San Jose ... was there mention of the possibility of using assets that were owned by individuals—Principals of Wolverton Associates to facilitate the payment of [its] debts?

Wolverton: I believe that was mentioned.

Committee: Was the Vacaville station mentioned in that context?

Wolverton: I don't recall whether it was mentioned in that context or as corporate assets.

. . . .

Committee: You said you did not give any thought to the fact that there was a lease on the property at the time you planned to sell it ... and I was curious as to whether you have any recollection concerning why you didn't give the subject any thought at the time?

Wolverton: I'm trying to recall myself exactly what I thought at the time. As originally stated, I considered this piece of property as an asset to pay off the creditors. The only thing I ever wanted was my $10,000.00 back that I had into it. Of course, my feelings changed when I became aware of Wickland's attachment of other personal property of mine. Also, I wanted to clear those off.... I

wanted to clear those off the estate and the way to do it was to sell this piece of property.

Committee: But you testified with regard to the fact that part of the—that an interest in the property in the form of a lease was held by Wolverton Associates at the time the property was sold.... is there some reason why you didn't think about the lease specifically at that time?

Wolverton: I think my overiding concern at that time was to get Wickland off my back personally, and I think that overrode a lot of my thinking, including the existence of the lease.

Committee: When you learned about the existence of an involuntary bankruptcy against Wolverton Associates did the existence of a lease on the Vacaville property occur to you as an important fact in that connection?

Wolverton: Yes, it did.

Committee: And why was that?

Wolverton: Well, when I found out that there was the involuntary bankruptcy petition filed, it occurred to me that Wolverton Associates having a leasehold in that property was an asset that belonged in the bankruptcy, or under the jurisdiction of the bankruptcy court.

Committee: And the same thing was true prior to the sale in that the involuntary bankruptcy

mattered (for example, when Wickland put him on the hook for Wolverton Associates' debt, or when the corporation was no longer in the family's hands), did Wolverton begin to think of his personal assets and those of Wolverton Associates as separate.

The bankruptcy court also pointed to the absence of any formal acts of surrender and the individuals' failure to exercise their option to cancel the lease as additional factors supporting its findings. The court realized that the doctrine of legal surrender requires conduct that implies an agreement to surrender the lease on the part of the lessor and lessee; but when they are the same actors, the "implied agreement" requirement becomes "implied intent," and the factfinder must look for acts which would reasonably imply an intent to effect a surrender.[5] Here, there was conduct that indicated that Wolverton Associates would no longer occupy the property, but not that it surrendered its entire interest in the property back to Charles Wolverton and the Berniers such that the sale proceeds would belong solely to the individuals.

In short, the court determined, in light of all the evidence, that the single act of requiring the purchasers of the Vacaville property to obtain a new lease did not justify declaring a legal surrender of Wolverton Associates' interest in the property (or the proceeds from the sale of the property) in the particular circumstances of this case. Nor did the court think an intended surrender had occurred. We affirm the court's determinations on the issue of surrender.

## II.

*The Value of the Leasehold Interest*

The parties in the adversary proceeding below both presented expert testimony concerning the bonus value,[6] if any, of Wolverton Associates' leasehold interest in the Vacaville property. Wickland's expert Fisk testified that the two-thirds of the property used as a service station had a value of 10.5 cents per foot per month, but that the third of the property consisting of a fully paved, improved, and "stubbed out" street had no value to a lessee. Consequently, he arrived at a discounted net present value of $17,000.

The Committee's expert La Bella testified that Wolverton Associates had the right to use the entire parcel, and that if it could not use the third of the leased property consisting of the stub street, it would have a claim against "someone" for that lost value. He therefore valued the entire property and arrived at a discounted net present value of $53,000.00, which worked out to about 8.0 cents per foot.

During cross-examination, counsel for the Committee asked Fisk to calculate the bonus value of the lease assuming the entire parcel were worth 10.5 cents per foot. His computation produced a figure over $100,000.00. Later, La Bella testified in "rebuttal" to Fisk's testimony and stated that while Fisk's valuation of the property at more than $100,000.00 was high, it was not unreasonable. Wickland objected to this testimony, claiming that it was not rebuttal testimony, but instead was an attempt to allow La Bella to revise upward his earlier valuation. The Committee assured the court that this was not its purpose, and the court overruled the objection.

The bankruptcy court held that the lessee Wolverton Associates did not have constructive notice that the third of the property consisting of the stub street was to be dedicated to the city of Vacaville as a pub-

---

had been filed only you didn't know it yet, right?

Wolverton: That's correct. Reporter's Transcript, pp. 240–43.

**5.** The Bankruptcy Appellate Panel's conclusion that a lessee's intent to surrender its lease is ineffective absent a manifestation by the lessor of its intent to accept such a surrender is incorrect. In *Kassan v. Stout,* 9 Cal.3d 39, 507 P.2d 87, 106 Cal Rptr. 783 (1973), the California Supreme Court merely held that if the lessor manifests an intent not to surrender the lease, this will prevent an otherwise effective surrender of the lease by the lessee.

**6.** "Bonus value" here refers to the net present value of the monthly savings created by the monthly rent being fixed at an amount below the fair market rent.

lic street during the period of the lease term. Therefore, it had a right to use and enjoyment of the entire property. It then held that the value of the entire property was 10.5 cents per foot per month. The court thus awarded $100,000.00 in actual damages. We reverse the bankruptcy court's actual damages calculation and remand for a new determination of the bonus value of the lease.

▮▮▮▮ Trial courts have broad discretion with respect to questions of valuation. *Ebben v. Commissioner*, 783 F.2d 906, 909 (9th Cir.1986). An award of damages will only be overturned if clearly unsupported by the evidence. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir.1985). However, the trier of fact may not act arbitrarily in disregarding entirely probable testimony of expert witnesses whose judgments have not been discredited, *Security–First Nat'l Bank v. Lutz*, 322 F.2d 348, 355 (9th Cir.1963), and a factfinder's damages calculation must find support in the record. *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir.1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

▮▮▮▮ Even assuming for the moment that the lessee Wolverton Associates had no constructive knowledge of the City of Vacaville's paramount title to the property and thus had a legitimate cause of action against "someone" for the value of the third of the leased premises improved and dedicated as a street, there is insufficient evidence to support the court's determination that this portion had a value of 10.5 cents per foot per month.

Fisk's testimony on cross-examination did not provide evidence that a valuation of 10.5 cents per foot was warranted. All he did was put figures into a calculator upon the request of the Committee's lawyer. The Committee's argument that "the court performed its own calculation of value, based on the conflicting expert testimony," is unpersuasive. The only conflicting expert testimony consisted of La Bella's direct testimony valuation of $53,000.00 and Fisk's direct testimony valuation of $17,-000.00. Fisk's mechanical calculation on cross and La Bella's attempt to support this calculation on rebuttal was not sufficient evidence to support the court's determination of actual damages.

▮▮▮▮ Moreover, we find that Wolverton Associates had constructive notice of the City of Vacaville's interest in the paved and improved stub street. Wolverton Associates' lease incorporated the 1968 parcel map showing that plans for the western third of the leased premises designated it a "future street." It also knew that portion of the property was in fact a paved, improved street. These two uncontroverted facts placed Wolverton Associates on inquiry notice that Vacaville had an interest in that portion of the property even though the 1977 agreement to dedicate the western third of the property to the city was not yet a matter of record title. Cal.Civ.Code § 19 (West 1982).

Our recent decision in *Probasco v. Eads*, 839 F.2d 1352 (9th Cir.1988), is instructive on this issue. In *Probasco*, the "purchaser" had record notice of unity of ownership between Eads and Probasco in two of three adjoining parcels and actual notice that the physical condition of all three parcels indicated unity of ownership. *Id.* at 1354. The court held that armed with this knowledge, a "prudent person" would have inquired whether the recorded one-half owner of parcel one and two (Probasco) also in fact had an interest in parcel three. We therefore reversed under the clearly erroneous standard because we were "left with the definite and firm conviction that the bankruptcy court made a mistake" regarding constructive notice. *Id.* at 1356.

*Probasco* applies here. A prudent person armed with record knowledge of plans for a "future street" on the portion of their leased property that they knew already was a paved and improved stub street would be on inquiry notice that Vacaville had an interest in the "street" on the premises.

We find it untenable to hold that Charles Wolverton and the Berniers somehow fooled their corporation into a long term lease of property partly held by the City of Vacaville, and that Wolverton Associates is entitled to compensation from them for its inability to use that third of the property dedicated to Vacaville.[7] Wolverton Associates was on inquiry notice, and an investigation would have revealed the dedication agreement. Therefore, on remand, the court should determine the lease bonus value for the useable portion of the leasehold property.

### III.

*Punitive Damages*

■■■■ Under California law, punitive damages can be awarded on the basis of deliberate wrongdoing or conscious disregard for the rights of others. *Hobbs v. Bateman Eichler Hill Richards, Inc.*, 164 Cal.App.3d 174, 195, 210 Cal.Rptr. 387, 400 (1985). We review for clear error the trial court's factual findings in support of a punitive damages award. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1347 (9th Cir. 1987).

■■■ Wickland argues that the imposition of damages is "wholly predicated" on a claimed conspiracy to frustrate and delay the filing and prosecution of the bankruptcy in order for Wickland to realize the fruits of the sale of the Vacaville property. This may exaggerate the court's actual finding, though, because ultimately the court only held that Wickland's conduct justified the imposition of punitive damages. Looking at those findings of fact and inferences that are supported in the record, a holding that Wickland's conduct warranted the imposition of punitive damages does not seem clearly erroneous.

■■■ The court articulated in detail the conduct it attributed to Wickland. The court found that Braunstein's conduct with respect to the bankruptcy prosecution was highly irregular, even suspicious. It found

---

7. It is not clear what the district court meant by its conclusion of law that Wolverton Associates would have a claim for "wrongful eviction" equal to the value of the leased portion dedicated away. It is difficult to imagine whom the Wolverton Associates would have had a cause of action against. Any knowledge, actual or constructive, that the principals of Wolverton Associates had would be imputed to the corporation. *Austin v. Hallmark Oil Co.*, 21 Cal.2d 718, 729, 134 P.2d 777, 784 (1943). Thus, any claim that a trustee on behalf of the Debtor might make against Charles Wolverton and the Berniers would run into the problem that, legally, a party cannot lie to itself.

The bankruptcy court's ruling does not elucidate how the lessee Wolverton Associates would succeed in an action against its principals. Appellee states in its brief that "unless [Wolverton Associates] had actual or constructive notice that parcel two was to be dedicated as a street, it would have a claim against [its principals] for the dimunition in value of its lease." In a footnote to this passage, the Committee states that a Chapter 7 trustee would have no hesitation in demanding that Wolverton Associates' principals provide it with everything it was entitled to under the lease.

Still, the theory behind such a suit against the principals is never explained. This is not a case where the seller promised something it knew it could not give because, again, if the principals knew, then the corporation knew. Also, the principals did not take a third of the property away from their corporation and acquire some personal benefit from giving it to Vacaville. The events that led to the dedication of the western third of the property were completed before the date of the lease agreement. If the principals did not know about the City's paramount title in the western third of the property, then there was a mutual mistake on the part of the parties who entered into the lease agreement. Mutual mistakes do not give rise to lawsuits for the benefit of the bargain.

Nor would Wolverton Associates or its principals have had a potentially successful claim against the City. *County of Imperial v. McDougal*, 19 Cal.3d 505, 564 P.2d 14, 138 Cal.Rptr. 472, *appeal dismissed*, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 306 (1977), stands for the proposition that enjoyment of the benefits of a conditional use permit bars a landowner or his successor in interest from challenging any conditions that the permit requires.

Thus, even assuming that neither the principals nor Wolverton Associates had actual or constructive notice of the paramount title of the City of Vacaville to that portion of the property consisting of a stubbed out street, it's inconceivable to us how Wolverton Associates could succeed in an action against anyone. This provides another reason for overturning the "bonus value" computation.

that Braunstein's failure to inform any other party in both the attachment and bankruptcy proceedings of important developments had no explanation other than to help Wickland; and help Wickland it did.

In fact, everything unfolded in such a way that Wickland alone benefitted, permitting the inference that Braunstein did what he could to make things unfold in that manner. Finally, the court found that Wickland retained the benefits of Braunstein's conduct even after confronted with evidence of foul play. This and other conduct on Wickland's part supported the court's finding of ratification, and thus the creation or evidence of an agency relationship. Cal.Civ.Code §§ 2307, 2310 (West 1985); 2 B Witkin, *Summary of California Law,* Agency and Employment §§ 39, 87, 89, 114 (9th ed. 1987).

■ A finding that Braunstein's conduct was in conscious disregard of the rights of others is well supported by the record. Nevertheless, the court's findings (which were apparently adopted verbatim from those proposed by the prevailing party) impute more wrongful conduct on Wickland's part than the record supports. While we do not have a firm and definite conviction that punitive damages were unwarranted, the court may have imposed them on Wickland for deliberately taking an asset of Wolverton Associates worth $100,000.00. The record only supports a finding that Wickland (through Braunstein) consciously disregarded the rights of the other creditors and Wolverton Associates, and should have made sure it was not taking an asset partly owned by Wolverton Associates (whose interest was considerably less than $100,000.00). We therefore instruct the court on remand to reevaluate the propriety and the amount of punitive damages awarded in light of our ruling.

## CONCLUSION

We AFFIRM the finding of the bankruptcy court that Wickland received a postpetition transfer of the value of Wolverton Associates' interest in the property. We REVERSE as clearly erroneous the court's computation of the bonus value of that interest. We INSTRUCT the court to recalculate actual damages and prejudgment interest. We also INSTRUCT the court to reconsider its punitive damages award in light of our disposition.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.