**In re STEVEN WINDSOR, INC., Debtor.**

**Bankruptcy No. 94–1–4818–PM.**

United States Bankruptcy Court,
D. Maryland.

Aug. 8, 1996.

Morton Faller, Washington, DC, Arthur Goldstein, Todtman, Young, Tunick, Nachamie, Hendler & Spizz, New York City, for debtor Steven Windsor, Inc.

Alan Eisler, Bethesda, MD, for creditor Duron, Inc.

Richard Gins, Washington, DC, for Official Creditors' Committee, George B. Spanos.

Eric Haber, Siegel, Sommers & Schwartz, New York City, for Official Creditors' Committee.

## MEMORANDUM OF DECISION

PAUL MANNES, Chief Judge.

Before the court is the debtor's objection to the unsecured claim of Duron, Inc. ("Duron"), filed on February 15, 1995, in the amount of $73,330.06. Specifically, the court must address whether Duron is entitled to lease rejection damages and, if so, the amount thereof.[1] A hearing was held on this matter on May 21, 1996. The parties submitted posthearing memoranda. For the reasons discussed below, the court will sustain the debtor's objection in part. Duron's claim for lease rejection damages in the amount of $56,793.41 will be reduced to $22,509.27.

## I. BACKGROUND

The relevant facts are not complicated. Duron is the owner of 16,000 square feet of non-residential real property located at 6528–A West Broad Street, Richmond, Virginia (the "Property"). On or about January 29, 1985, Duron leased 5,000 square feet of the Property to the debtor (the "Leased Premises") pursuant to a written lease agreement (the "Lease"). On September 9, 1994, debtor filed a case under Chapter 11 of the Bankruptcy Code. On debtor's motion, this court entered an order rejecting the Lease, effective as of October 31, 1994.

Subsequent to obtaining possession, Duron made no attempt to re-let the Leased Premises, because it was considering using the additional space for its own purposes. In March of 1995, Duron approved plans to open a new regional service center on the Leased Premises. The actual construction of the service center, however, did not commence until February of 1996, because Duron did not want to disrupt the operation of its paint and wall covering stores that were located on the Property.[2]

## II. DISCUSSION

The dispute between the parties arises from the events that transpired subsequent to the rejection date. The debtor's position is that Duron did not incur any damages subsequent to the rejection of the Lease because Duron re-entered the premises intending to utilize the space for its own purposes and benefit. By virtue of Duron's intent to use the Leased Premises for its own purposes, it accepted the debtor's surrender of the premises when it took possession. Accordingly, the obligation to pay rent under the rejected lease was terminated and no further liability could befall the debtor subsequent to the rejection date. On the other hand, Duron asserts that it did not accept the debtor's surrender of the property at any time. Duron urges that the debtor remains liable for all damages sustained as a result of its rejection of the Lease subject only to the

---

1. The other components of Duron's claim were settled by this court's Order entered April 20, 1995.

2. Duron states that the paint and wall covering stores would have to be relocated before the new service center could be constructed.

statutory cap imposed by 11 U.S.C. § 502(b)(6). Thus, it urges under 11 U.S.C. § 502(b)(6) that it is entitled to one year's rent in the amount of $56,793.41.

The determination of Duron's lease rejection damage claim is controlled by 11 U.S.C. § 502(b)(6). That section provides, in pertinent part:

**§ 502. Allowance of claims or interests.**

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease or real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

■ Section 502(b)(6) is not a formula for determining the total allowable damages incurred by a lessor. Rather, this section merely casts a limitation on the amount a lessor may claim for unpaid rent. *In re Allegheny Intern., Inc.*, 136 B.R. 396 (BC W.D.Pa.1991), *aff'd and remanded*, 145 B.R. 823 (W.D.Pa.1992). The amount of the lessor's claim therefore must be ascertained prior to the application of § 502(b)(6). *In re All for A Dollar, Inc.*, 191 B.R. 262, 264–65 (BC Mass.1996); *In re Thompson*, 116 B.R. 610, 613 (BC S.D.Ohio 1990).

■ The determination of property rights under lease agreements and otherwise is governed by state law and the agreement between the parties. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Financial News Network, Inc.*, 149 B.R. 348, 352 (BC S.D.N.Y.1993) (quoting *In re First Alliance Corp.*, 126 B.R. 589, 591 (BC S.D.Cal.1991)); *see also In re Merry-Go-Round Enterprises, Inc.*, BC Nos. 94–5–0161–SD to 94–5–0163–SD, 94–5–3774–SD, 95–5–4523–SD, 1996 WL 69688 (BC Md. Jan. 23, 1996) (Derby, J.) ("Bankruptcy looks to state law to determine property rights, and such a determination would include when a lease is terminated"). The parties agree that Virginia law controls whether Duron, by entering the premises and using the property for its own purposes, accepted the debtor's surrender of the Leased Premises and terminated the debtor's obligation to pay additional rent. But this task is made difficult by the absence of Virginia law directly on point as manifest in the parties' memoranda. For this reason, the court expanded its search nationwide.

■ In order to be successful in the defense of surrender, the debtor must demonstrate both an intent to surrender the Leased Premises, and acceptance of the surrender by Duron. *Sanden v. Hanson*, 201 N.W.2d 404, 409 (N.D.1972). The issues of whether the debtor has surrendered the property, and whether the landlord accepted the surrender are governed by the intent of the parties and are questions of fact. 49 Am.Jur.2d, *Landlord and Tenant*, §§ 250 and 257 (1995); *see also In re Wolverton Assoc.*, 909 F.2d 1286, 1292 (C.A.9 1990) (the court, applying California law, stated that "whether there has been a surrender, actual or by implication, is a question of fact"); *In re Allegheny Int'l, Inc.*, 136 B.R. 396, 404 (BC W.D.Pa.1991), *aff'd and remanded*, 145 B.R. 823 (W.D.Pa.1992) (the court, applying Pennsylvania law, noted that the surrender of a lease is governed by the intention of the parties).

■ Under common law,[3] abandonment is deemed to have occurred "when a tenant

---

3. In Virginia, common law governs the remedies

of a landlord in an action against his tenant in

voluntarily relinquishes or vacates the leased premises with the intention to terminate contractual rights to exclusive possession and control of the premises." 49 Am.Jur.2d, *Landlord and Tenant*, § 250, at 239 (1995); *see also tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 n. 5 (C.A.4 1976) ("As a general rule, an "abandonment" of a lease occurs when the lessee leaves the premises vacant with the avowed intention not to pay rent"). Thus, to constitute abandonment of the premises, one must demonstrate absolute vacation of the premises, and a clear intent not to pay rent or to be bound by the lease. *tenBraak*, 542 F.2d at 924 n. 5; *see also Nehi Bottling Co., Inc. v. All–American Bottling Corp.*, 8 F.3d 157, 162–63 (C.A.4 1993) (applying Virginia law).

■ In the instant case, it is undisputed that the debtor abandoned the Leased Premises. The debtor rejected the Lease as of October 31, 1994. Also on that date, the debtor relinquished possession of the Leased Premises by mailing the keys to Duron, removed all of its personal property, and ceased all business operations. This court finds that debtor's actions are conclusive of the debtor's intent to abandon the Leased Premises as of October 31, 1994. *See Sanden v. Hanson*, 201 N.W.2d 404, 409–10 (N.D.1972).

■ A more difficult issue is whether Duron accepted the debtor's abandonment of the Leased Premises so that it may be considered a surrender.[4] Where a tenant abandons property prior to the expiration of the term of the lease, the lessor generally has a number of options under Virginia law. These alternatives were reviewed by the Court of Appeals for the Fourth Circuit, in the case of *tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919 (C.A.4 1976). That court stated:

> Although the landlord at common law had only a single remedy for his tenant's nonpayment of rent, jurisdictions which

adhere to common law principles have generally recognized that he has an additional remedy in cases such as the present one, in which abandonment occurs. The general rule is that upon abandonment by his tenant the landlord is permitted either to treat the abandonment simply as a default in the payment of rent, allowing him to continue to recover rents which fall due under the contract, or to consider the abandonment a surrender by the tenant, permitting him to re-enter the leased premises. If the landlord elects to keep the lease in effect and recover on the lease-contract, he is entitled to any rents which accrue during the remainder of the term but, if he elects to re-enter, his re-entry is deemed an acceptance of the tenant's surrender, and the lease is considered terminated by the mutual agreement of the parties. *See* Annot., 13 L.R.A. 398 (1908).

> We note that the Virginia cases which consider a tenant's liability following abandonment have followed this general rule; thus, when a tenant abandons leased property during the term, the Supreme Court of Appeals of Virginia has held that the landlord is permitted, at his option, either (1) to refuse to accept the tenant's surrender, do nothing and sue for accrued rents, or (2) to re-enter the premises and accept the tenant's surrender, thereby terminating the lease and releasing the tenant from further liability. *Crowder v. Virginian Bank of Commerce*, 127 Va. 299, 103 S.E. 578 (1920).

*Id.* at 924. The Court of Appeals noted further that, under Virginia law, the lessor may re-enter the premises without terminating the lease so long as the lessor has entered the premises only for the limited purposes of re-letting the property. *Id.* at 925; *see also Hoster–Columbus Associated Breweries Co. v. Stag Hotel Corp.*, 111 Va. 223, 225–26, 68 S.E. 50 (1910). In light of the various alternatives afforded to a landlord, the question of whether the landlord has

---

the absence of express statutory or judicial modification. *tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 923 (C.A.4 1976).

4. A surrender is defined as "a yielding up of the tenancy to the owner of the reversion or remain-

der so that the tenancy is submerged and extinguished by agreement or by operation of law." 49 Am.Jur.2d, *Landlord and Tenant*, § 242, at 232 (1995). Stated more simply it is the giving up of a lease prior to its expiration. *Id.*

accepted the debtor's surrender of the premises is heavily dependent on the facts and circumstances of the particular case. 49 Am. Jur.2d, *Landlord and Tenant,* § 243, at 234 (1995).

Acceptance of a tenant's abandonment may be discerned from express acceptance by the landlord, or through acts or conduct clearly indicating an intent to accept abandonment. *Id.* at § 245, at 235. Here, in the absence of any contention that the surrender and acceptance occurred through the express agreement of the parties, there remains only the possibility of acceptance by implication. Courts dealing with a landlord's acceptance through implication caution that the actions of the landlord subsequent to the abandonment must be substantial enough to evidence reappropriation of the premises and an intent to foreclose any future rights of the tenant in the premises. *See, e.g., Pague v. Petroleum Products, Inc.,* 77 Wash.2d 219, 461 P.2d 317 (1969). A landlord's re-entry into the premises following a breach by the lessee, by itself, generally is not sufficient to result in the lessor's acceptance of the surrender. *See Klosterman v. Hickel Inv. Co.,* 821 P.2d 118 (Ala.1991); *Hoster–Columbus Associated Breweries Co. v. Stag Hotel Corp.,* 111 Va. 223, 225–26, 68 S.E. 50 (1910). In many jurisdictions, however, a landlord's re-entry into the premises and utilization of the premises for its own purposes is sufficient to constitute an implied acceptance of the tenant's abandonment thereby terminating the debtor's liability under the lease. *Mesilla Valley Mall Co. v. Crown Industries,* 111 N.M. 663, 665, 808 P.2d 633, 635 (1991); *Price v. S.S. Fuller, Inc.,* 639 P.2d 1003, 1006 (Ala.1982); *Sanden v. Hanson,* 201 N.W.2d 404, 410 (N.D.1972); *Anderson v. Andy Darling Pontiac, Inc.,* 257 Wis. 371, 374, 43 N.W.2d 362, 364 (1950); *Richter v. Fassett,* 253 Wis. 101, 104, 33 N.W.2d 230, 232 (1948).

The record here reflects that at no time subsequent to regaining possession did Duron attempt to re-let the premises as it was considering using the premises as the site for a new regional service center. The record also reflects that Duron did not make the final decision to use the premises for its new regional sales center until March of 1995. Based on the evidence in the record, until March of 1995, the intentions of Duron with respect to the Leased Premises can not be ascertained by this court with any certainty. As of March of 1995 Duron's intent to use the Leased Premises for its own benefit became crystal clear. This court therefore concludes that Duron accepted the surrender of the Leased Premises by implication when it made the final decision to use the premises for its new regional service center. Upon making the decision to use the premises for its own benefit, Duron capped its claim and released the debtor from any further liability imposed upon it by the terms of the Lease. Accordingly, Duron's allowed claim for lease rejection damages will be limited to $22,509.27 which represents the amount of rent accumulated from September 9, 1994, the petition date, to March 1, 1995, less the administrative expense claim already allowed.

Because the allowed lease rejections damages do not amount to more than one year's rent, the statutory cap imposed by 11 U.S.C. § 502(b)(6) is not applicable. Consequently, this court need not address whether any amount in excess of the $56,793.41 should be deducted from the landlord's overall claim for lease rejection damages or from the amount already capped pursuant to § 502(b)(6).